# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3697

_____

United States of America

*Plaintiff - Appellee*

v.

Cameron Arnold

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: June 14, 2016
Filed: August 31, 2016

_____

Before SMITH and GRUENDER, Circuit Judges, and KETCHMARK,[1] District
Judge.

_____

KETCHMARK, District Judge.

_____

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the
Western District of Missouri, sitting by designation.

Following a jury trial, Cameron Arnold was convicted of conspiracy to commit bank robberies and three counts of aiding and abetting the robbery of those banks. Arnold now appeals the district court's[2] denial of his motion to suppress, ruling on his *Batson* challenges, and imposition of his sentence.[3] We affirm.

I.

On March 24, 2014, an Iberia Bank branch in Little Rock, Arkansas, was robbed. Detective Bobby Martin in the robbery unit with the Little Rock Police Department testified that Devonta Piggee was developed as a suspect and was arrested for the armed bank robbery. Piggee gave a statement to police that the person involved with him was from Pine Bluff, Arkansas, and named "Cam." As a part of the Iberia Bank robbery investigation, a detective from the Pine Bluff Police Department was contacted, and he identified "Cam" as Arnold. Seven weeks later, on May 13, 2014, a U.S. Bank in Little Rock was robbed. At this point, the Little Rock Police Department began investigating Keyontae Johnson as a suspect. Officers were aware that Piggee, Johnson, and Arnold were all from Pine Bluff.

Two days after the armed robbery of the U.S. Bank, on May 15, 2014, Detective Martin received an anonymous telephone call. The caller told Detective Martin that Johnson was leaving Pine Bluff, and headed toward Little Rock to commit another bank robbery. The caller stated that Johnson was driving a gray Ford Taurus with a temporary license plate from Dane's Auto Sales. Detective Martin then alerted his squad to this information. Later that day, Detective Martin learned that there had been an armed robbery of a bank in Benton, Arkansas. When Detective Martin notified the Benton Police Department about the

---

[2]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

[3]Upon Arnold's motion, this Court ordered that the case be submitted on the briefs without oral argument.

anonymous tip, the department confirmed that a gray Ford Taurus had been involved in the armed robbery that morning.

Based on the determination that Johnson probably was involved in the armed robbery and would be returning to Pine Bluff, Little Rock Police Officers searched for the gray Taurus by traveling south on Interstate 530 from Little Rock toward Pine Bluff. Little Rock Police Detective Carrie Mauldin, in an unmarked patrol unit, located the gray Taurus at approximately mile marker 22 of Interstate 530. At this point, Little Rock Detective Grant Humphries, who was also in an unmarked patrol unit, joined Detective Mauldin. The two officers then followed the vehicle as it exited the interstate at mile marker 34. At the same time, law enforcement officers in marked patrol units from other agencies in that vicinity also joined to assist. After exiting Interstate 530 and taking two left turns, the gray Taurus was stopped by a roadblock of marked patrol cars. As it turned out, the roadblock stopped two cars. The other car stopped was a black Honda that had been traveling in front of the gray Taurus.

When Detective Martin arrived on the scene a few minutes after the stop, Johnson had been placed in the back of a patrol car. Detective Martin approached Johnson to verify that the individual in the patrol car matched the photograph he had obtained in the U.S. Bank robbery investigation. When Detective Martin looked into the patrol car, Johnson said something to the effect that the car ahead was involved. The black Honda contained two occupants, a female driver and Arnold, who was seated as a passenger. As part of the Iberia Bank robbery investigation, in which Arnold was identified as "Cam," Detective Martin was aware that there was an outstanding warrant for Arnold's arrest. After Arnold provided identification, he and the female driver were taken into custody. Arnold's vehicle was stopped only five or six minutes before he was identified as a suspect in the Benton bank robbery that had just occurred. All three individuals that had been stopped by the roadblock were then transported to the Little Rock

Police Department. Once at the police station, officers discovered that the female driver had more than $3,200 on her person.[4]

On September 11, 2014, a grand jury charged Arnold in a four-count indictment with conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (Count 1); and three counts of aiding and abetting the robbery of a federally insured bank, for the March 24, May 13, and May 15 bank robberies, in violation of 18 U.S.C. §§ 2113(a) and (d) (Counts 2, 3, and 4). Along with Arnold, Piggee was indicted in Counts 1 and 2, and Johnson was indicted in Counts 1, 3, and 4. Piggee and Johnson each pleaded guilty and were eventually sentenced to 30 months' imprisonment, three years supervised release, and payment of restitution in the amounts of $4,907 for Johnson and $7,694 for Piggee. After the indictment, Arnold filed a motion to suppress the cash[5] and his statement obtained as a result of the May 15, 2014 vehicle stop. The district court denied the motion following an evidentiary hearing at which the district court heard testimony from three government witnesses: Detectives Martin, Mauldin, and Humphries. In a two-day jury trial beginning on June 22, 2015, the jury found Arnold guilty on all counts. Piggee and Johnson testified at Arnold's trial. The district court later sentenced Arnold to an aggregate term of 210 months' imprisonment followed by three years of supervised release, and payment of $12,601 in restitution.

## II.

Arnold presents three challenges on appeal. First, he argues that the initial stop violated his Fourth Amendment rights because officers lacked probable cause

---

[4]At the police station, Detective Mauldin discovered that the female driver concealed $645 in her bra and also found $2,650 in the toilet after the female driver had exited the restroom.

[5]In Arnold's motion to suppress, he stated that the government's theory of the case is that Arnold gave money from the robbery to the female driver and asked her to hide it on her person. Arnold argues that based on this theory, the cash found on, or believed to have been on the female driver should be suppressed.

or reasonable suspicion to make the stop. Second, he argues that the district court erred in overruling his challenge to several of the government's peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986). Finally, Arnold maintains that his sentence is substantively unreasonable in comparison with the sentences imposed on his co-defendants.

## A. Motion to Suppress

Arnold argues that the stop of the vehicle in which he was a passenger was unlawful because the justification for it rested solely on an anonymous telephone call and there was no indication that the caller was reliable.[6] In an appeal challenging the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Burston*, 806 F.3d 1123, 1126 (8th Cir. 2015) (citation omitted).

To support his contention that the initial vehicle stop was unlawful, Arnold cites Supreme Court cases, *Alabama v. White*, 496 U.S. 325, 327-29 (1990) and *Florida v. J.L.*, 529 U.S. 266, 270 (2000), for the proposition that a standalone anonymous tip must possess sufficient indicia of reliability to justify an investigatory stop. It is well settled under *Terry* that an investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion that the person stopped is involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001). In *White* and *J.L.*, the Supreme Court applied the reasonable suspicion standard in circumstances where the supporting information known to the officers came from anonymous calls about concealed criminal activity. *White*, 496 U.S. at 332 (information from anonymous tip justified the stop where the tip bore adequate indicia of reliability); *J.L.*, 529 U.S. at 271 (information from anonymous tip did not create reasonable suspicion where

---

[6]As a threshold issue, Defendant correctly points out that he may challenge the constitutionality of the May 15, 2014 vehicle stop as a mere passenger. *Brendlin v. California*, 551 U.S. 249, 255-57 (2007) (holding that a passenger is seized during a traffic stop and may therefore challenge the stop itself).

the caller provided no information from which the police could form a basis for believing that the tipster had knowledge of any criminal activity).

Arnold's argument misapprehends the correct standard to be applied in this case. Specifically, in certain circumstances, the Supreme Court has upheld brief, suspicionless seizures, such as roadblocks. *See Illinois v. Lidster*, 540 U.S. 419, 424 (2004) ("[S]pecial law enforcement concerns will sometimes justify highway stops without individualized suspicion."). For the reasons discussed below, the constitutionality of the roadblock turns on reasonableness, not individualized suspicion. Thus, the question is whether the roadblock was reasonable under the Fourth Amendment when at the time of the stop, police did not have individualized suspicion for the car in which Arnold was a passenger.

In denying Arnold's motion to suppress, the district court adopted the Tenth Circuit's analysis of a roadblock in *United States v. Paetsch*, 782 F.3d 1162 (10th Cir. 2015), after concluding that the cases were substantially similar. We also adopt *Paetsch's* reasoning. In *Paetsch*, the defendant robbed a bank and was given money that contained a tracking device. 782 F.3d at 1165-6. The tracking device allowed police to locate Paetsch within approximately a 60 foot diameter. *Id.* at 1166. Within about 15 minutes of the armed bank robbery's occurrence, officers had created a roadblock designed to stop the vehicle containing the tracking device. *Id.* As a result of the roadblock, officers stopped a total of twenty cars containing twenty-nine people. *Id.* Paetsch's car was among the cars stopped. *Id.* at 1167. After some difficulty in isolating the tracker's signal, the officers eventually identified Paetsch's car as containing the stolen money. *Id.* The Tenth Circuit affirmed the denial of Paetsch's motion to suppress in which he argued, *inter alia*, that the initial stop violated his Fourth Amendment rights. *Id.* at 1168.

Ultimately, the Tenth Circuit concluded that the roadblock was constitutional at its inception because it was "'appropriately tailored' to catch a fleeing, armed bank robber." *Id.* The Tenth Circuit further concluded that "the gravity of the public concern in apprehending the armed bank robber and the

likelihood of advancing the public interest justified the intrusion on individual liberty—at least until police developed individualized reasonable suspicion of Paetsch." *Id.* In finding that the roadblock was permissible, the Tenth Circuit recognized that police lacked reasonable suspicion for any particular person stopped by the roadblock. *Id.* at 1169. The Tenth Circuit reasoned, however, that "the touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Id.* (quoting *Samson v. California*, 547 U.S. 843, 855 n.4 (2006)). The Tenth Circuit then engaged in a thorough discussion of precedent in Fourth Amendment seizure cases, specifically group seizures without individualized reasonable suspicion, such as roadblocks and checkpoints. *Id.* at 1169-70. In accordance with this precedent, the Tenth Circuit applied the balancing test announced in *Brown v. Texas*, 443 U.S. 47 (1979), weighing the public interests against intrusions on individuals' liberty. *Paetsch*, 782 F.3d at 1169.

In determining whether the roadblock was reasonable, we must balance the following factors as set out in *Brown*: (1) the gravity of the public concerns served by the seizure; (2) the degree to which the seizure advances the public interest; and, (3) the severity of the interference with individual liberty. 443 U.S. at 51; *see also Brouhard v. Lee*, 125 F.3d 656, 659 (8th Cir. 1997) (noting in the context of a civil rights action that highway checkpoints are reasonable under the Fourth Amendment if they maintained a proper balance between the *Brown* factors). A central concern in this balancing test is to guard individual liberties against "arbitrary invasions at the unfettered discretion" of law enforcement authorities. *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 654-655 (1979), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 882 (1975)). Accordingly, the Supreme Court has upheld certain types of brief roadblocks without individualized suspicion where the public interests advanced by the seizure outweighed the Fourth Amendment interests of the individual seized. *Compare Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990) (upholding sobriety checkpoint program to combat drunk driving), *and United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (upholding Border Patrol checkpoint to intercept illegal immigrants), *with Brignoni-Ponce*, 422 U.S. at 882-4 (random Border Patrol roving-patrol stop to intercept illegal

immigrants was impermissible), *Prouse*, 440 U.S. at 659-63 (random spot checks to verify motorist's driver's license and registration without reasonable suspicion was impermissible), *and City of Indianapolis v. Edmond*, 531 U.S. 32, 47-48 (2000) (suspicionless stop at highway checkpoint was unreasonable where its primary purpose was indistinguishable from a general interest in crime control).

### 1. *The Gravity of the Public Concerns Served by the Seizure*

As the district court found, here, officers had reliable information implicating Johnson in two armed bank robberies and indicating that he was likely fleeing from the second armed bank robbery. These circumstances clearly represent a substantial public interest. *See Paetsch*, 782 F.3d at 1170-1 (citing *United States v. Abbott*, 265 F. App'x 307, 309 (5th Cir. 2008) (per curiam) ("The public concern of apprehending armed bank robbers was substantial.") (other citation omitted)).

### 2. *The Degree to Which the Seizure Advanced the Public Interest*

We next analyze the degree to which the seizure advanced the public interest by assessing the effectiveness of the roadblock in achieving the goal of apprehending an armed bank robber. Specifically, we consider what percentage of the total seizures uncovered criminal activity. The hit rate in *Paetsch* was 5 percent because the twenty cars were detained included one bank robber. 782 F.3d at 1171. In this case, only two cars were stopped and all three of the occupants were determined to have been involved in the armed robbery, representing a 100 percent hit rate, far in excess of the other roadblocks upheld by the Supreme Court as noted in *Paetsch*. *See, e.g., Sitz*, 496 U.S. at 454-5 (upholding sobriety checkpoint with 1.6 percent hit rate, or arrest of two drunk drivers out of 126 vehicles stopped); *Martinez-Fuerte*, 428 U.S. at 554 (upholding border checkpoint where illegal aliens were found in 0.12 percent of the vehicles stopped by the checkpoint).

In addition to the hit rate, the roadblock's effectiveness is proven by the outcome in that three bank robbery suspects were taken into custody. This case is

thereby distinguishable from programmatic checkpoints where each "hit" only incrementally advances the public interest served by the seizure. *See Paetsch*, 782 F.3d at 1171. Moreover, officers knew the roadblock would be effective because they knew the description of the vehicle that Johnson was driving and knew the route he was likely to be traveling to return to the city in which he was living. *See id.*; *Edmond*, 531 U.S. at 44 (an emergency roadblock without particularized suspicion must only be used where a criminal is "likely to flee by way of a particular route"). We also note that officers were not required to employ a less intrusive means to apprehend Johnson rather than employ the roadblock. *Paetsch*, 782 F.3d at 1172; *see Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 837 (2002) (the Fourth Amendment does not require police to use the least intrusive means to apprehend the offender). Under these circumstances, the roadblock significantly advanced the public interest.

### 3. The Severity of the Interference with Individual Liberty

We next must weigh the first two *Brown* factors against the third factor, the severity of the interference with individual liberty. *Paetsch*, 782 F.3d at 1172. Upon examining the circumstances in this case, we conclude that the public interests advanced by the roadblock far outweighed Arnold's individual Fourth Amendment interests. As identified in *Paetsch*, there are three important considerations. First, the Fourth Amendment affords police more latitude, and in turn, affords individuals less protection, with respect to cars as compared with dwellings. *Id.* Second, whether officers took "reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *Id.* (quoting *Illinois v. McArthur*, 531 U.S. 326, 332 (2001)). Third, whether "the duration of the seizure was no longer than reasonably necessary for the police, acting with diligence, to identify the perpetrator." *Id.* (internal quotation marks omitted).

As found by the district court, the roadblock was appropriately tailored to stop the vehicle that Johnson was believed to be driving. At the time of the stop, officers had individualized suspicion that implicated Johnson in two armed bank robberies and that he was fleeing from the second robbery. As it happened,

Johnson was following the car in which Arnold was a passenger. Although Arnold's vehicle was not known to be involved in the robbery at the time of the roadblock, officers had reliable information that the bank robber was among the two cars that were stopped. Within five or six minutes of being detained, officers took Arnold into custody based on Johnson's indication that Arnold's vehicle was involved, having previously developed him as a suspect in the Iberia Bank robbery, and the knowledge that he had an outstanding warrant for his arrest. Consequently, the officers' employment of the roadblock was reasonable. The district court properly denied Arnold's motion to suppress.

## B. *Batson Challenges*

The second issue Arnold raises on appeal is the district court's denial of his *Batson* challenges to the government's peremptory strike of two potential jurors. Because the district court's ruling on objections to peremptory strikes largely turns on findings of fact, including the weighing of credibility, we review the district court's decision for clear error. *United States v. Ellison*, 616 F.3d 829, 832 (8th Cir. 2010) (citing *Batson*, 476 U.S. at 98 n.21, and *United States v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990)).

The Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges to strike potential jurors solely based on race. *Batson*, 476 U.S. at 89. Upon a prima facie showing that a peremptory challenge is racially motivated, the proponent must show a race-neutral explanation to overcome the objection. *Ellison*, 616 F.3d at 832. "Once the striking party provides a race-neutral explanation for the strike, the objecting party may come forward with a reason or reasons why the proffered explanation is really a pretext for discrimination." *United States v. Maxwell*, 473 F.3d 868, 871 (8th Cir. 2007) (citation omitted). The district court then determines whether the objecting party has met its burden to show purposeful discrimination. *Ellison*, 616 F.3d at 832.

During voir dire, defense counsel posed the following questions to the members of the venire:

Do you believe that the police can make mistakes investigating a crime? You've heard of that to happen sometimes? Do you believe the Little Rock Police Department could make mistakes investigating a crime? That the Pine Bluff police could make the same mistakes, or make mistakes? And even the FBI? Okay. We're all human. We would agree that anybody who is human is capable of making some kind of mistake. Is that correct?

Subsequently, the government exercised its peremptory strikes on three potential jurors who were females and who appeared to be African American. Arnold, who is African American, lodged objections to the strikes, arguing that the government struck these potential jurors based on improper racial considerations in violation of *Batson*. On appeal, Arnold now challenges the district court's denial of two of the three peremptory strikes of potential jurors: Ms. B and Ms. F.

Upon Arnold asserting his *Batson* challenges at trial, the government first pointed out that "there were a number of African American members of the jury that we did not strike." The government then offered two race-neutral explanations for striking Ms. B: (1) she previously served on a hung jury, and (2) she was "very animated" when defense counsel posed the questions stated above. Regarding Ms. F, the government stated that: (1) she is currently on a "committee that serves to adjudicate issues," and (2) she, too, was "very agreeable" in response to defense counsel's questions. Based on the decision-making involved, the government likened Ms. F serving on this committee to being an attorney. The government explained that while there were no attorneys or lawyers on the venire, this was "the closest thing you can get" to one. The government added that "[w]e struck everyone, to my knowledge, that my notes say that served on a hung jury." The district court denied the *Batson* challenges, finding that these explanations were "legitimate, nondiscriminatory reasons" and that according to the court's notes, there were five other "African Americans who the government did not strike."

Arnold contends that the real reason for moving to strike Ms. B and Ms. F was that they exhibited strong agreement with the suggestion that police could be wrong. Arnold appears to assert that, by itself, this explanation is illegitimate and discriminatory because distrust of police officers is prevalent among African Americans. Reviewing the voir dire record, we conclude that the district court did not clearly err in denying Arnold's *Batson* challenges with respect to Ms. B and Ms. F. Based on their "very animated" or "very agreeable" response to defense counsel's questions, concern about their potential bias or dissatisfaction with law enforcement by itself was a legitimate reason for the government to strike the two jurors. *See United States v. Crawford*, 413 F.3d 873, 875 (8th Cir. 2005) (per curiam) ("A juror's bias or dissatisfaction with law enforcement is a race-neutral reason for striking the juror.") (citing *Gee v. Groose*, 110 F.3d 1346, 1351 (8th Cir. 1997), and *United States v. Gibson*, 105 F.3d 1229, 1232 (8th Cir. 1997)); *United States v. Booker*, 576 F.3d 506, 511 (8th Cir. 2009); *see also United States v. Swinney*, 970 F.2d 494, 496 (8th Cir. 1992) (the government may use "intuitive guesses about jurors' attitudes" toward the government, relying on jurors' statements during voir dire as well as general demeanor).

Arnold next argues that the government made no indication that any of the Caucasian members of the jury panel believed police could be wrong. To the extent Arnold attempts to raise that there may have been similarly situated Caucasian jurors who were not struck by the government, Arnold did not raise the issue below. Therefore, "we will not consider claims of pretext based upon the failure to strike similarly situated jurors unless the point was raised in the district court." *United States v. Allen*, 644 F.3d 748, 753 (8th Cir. 2011) (quoting *United States v. Walley*, 567 F.3d 354, 358 (8th Cir. 2009)); *United States v. Gibson*, 105 F.3d 1229, 1232 (8th Cir. 1997) ("a 'similarly situated' argument is untimely and cannot be made if it is raised for the first time on appeal rather than at the trial level").

Accordingly, Arnold fails to show pretext for race discrimination, and we affirm the district court's denial of Arnold's *Batson* challenges.

## C. Sentencing

Arnold's final argument challenges the substantive reasonableness of his sentence based on his assertion that it is unreasonably long in relation to his co-defendants. Arnold's sentence included 210 months' imprisonment, while co-defendants, Piggee and Johnson, were each sentenced to a term of 30 months.

"We review a district court's sentence in two steps: first, we review for significant procedural error; and second, if there is no significant procedural error, we review for substantive reasonableness." *United States v. O'Connor*, 567 F.3d 395, 397 (8th Cir. 2009) (citing *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007)). Because Arnold makes no argument that the district court committed any procedural error, we move directly to the second step. *United States v. Maxwell*, 664 F.3d 240, 245 (8th Cir. 2011) (citing *O'Connor*, 567 F.3d at 397. We review the substantive reasonableness of a sentence under the abuse-of-discretion standard. *Id.* at 244-5 (citations omitted). "[I]t is not an abuse of discretion for a district court to impose a sentence that results in a disparity between co-defendants when there are legitimate distinctions between the co-defendants." *United States v. Rojas-Olivera*, 564 F. App'x 249, 250 (8th Cir. 2014) (citations and internal quotations omitted).

Arnold argues that his sentence was excessive in light of the disparity factor of 18 U.S.C. § 3553(a)(6) in that it created "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Arnold submits that any sentence of more than three times his co-defendant's sentence, or 93 months' incarceration, is substantively unreasonable. We find no abuse of discretion. *See United States v. Plaza*, 471 F.3d 876, 880 (8th Cir. 2006) (holding that when a defendant is not similarly situated to his co-defendant, the district court does not need to impose sentences of the same length to avoid an unwarranted sentencing disparity).

We conclude that there are legitimate distinctions to support his longer sentence. At sentencing, the district court stated that it considered the need to avoid a sentencing disparity. The record shows that the district court considered the defendants' relative ages, as well as Arnold's culpability and extensive criminal history. Specifically, the district court stated that not only did Arnold, who is 30 years old, persuade "these two boys"—ages 18 and 19—to commit the three bank robberies, but he "furnished them a gun, gave them instructions, sent them into the banks, told them what to do, and then they provided [Arnold] the money afterwards." The district court further noted the following as to Arnold's culpability:

> [I]n my mind, the circumstances of it are worse for Mr. Arnold than if he had gone in by himself, because he sent these 18, 19-year-old boys in to do it, without any control over what was going to happen when they got in there. And he put them at risk rather than himself, and he put other people at risk, because there's no telling what these kids would do with the guns that he furnished for them. And so in my mind, this is actually worse than if he'd gone in by himself, where he had the gun and was in control.

In addition, Piggee and Johnson pleaded guilty and testified at Arnold's trial. *See United States v. Chaika*, 695 F.3d 741, 746 (8th Cir. 2012) ("A defendant's cooperation with the government is a legitimate basis for sentencing disparity."). Despite Arnold's contention that he should be sentenced for no longer than 93 months, the district court's imposition of 210 months was at the low end of the applicable guideline range. *United States v. Paulino-Duarte*, 670 F.3d 842, 844 (8th Cir. 2012) (we presume that a sentence imposed within the advisory guideline range is reasonable). In view of Arnold's offense conduct and history, we hold that the district court's sentence of 210 months' incarceration was not unreasonable. [7]

---

[7]On March 18, 2016, appellee moved to supplement the record with the sentencing transcripts for Piggee and Johnson. Because we find Arnold's challenge to his sentence unavailing, we deny the motion as moot.

## III.

For these reasons, we affirm the district court.

_____