# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-2929

_____

United States of America

*Plaintiff - Appellee*

v.

Sherman Johnson, Jr.

*Defendant - Appellant*

_____

No. 18-3156

_____

United States of America

*Plaintiff - Appellee*

v.

Sarkis Labachyan

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 12, 2019
Filed: April 2, 2020
_____

Before GRUENDER, KELLY, and ERICKSON, Circuit Judges.
_____

ERICKSON, Circuit Judge.

Sarkis Labachyan and Sherman Johnson, Jr. were each charged with possession with intent to distribute cocaine, 21 U.S.C. § 841(a), and conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846. Labachyan and Johnson were convicted on all charges following a jury trial. On appeal, Labachyan asserts the district court erred when it failed to suppress certain statements. Johnson asserts that his Batson challenge should have been sustained. Both argue the evidence was insufficient to support their convictions. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. Background

On June 21, 2016, Douglas County Deputy Sheriff Eric Olson stopped a van traveling near Omaha, Nebraska, for following too closely to another vehicle. The van's driver was defendant Sarkis Labachyan. Defendant Sherman Johnson, Jr. was in the front passenger seat. After Labachyan handed Deputy Olson the rental agreement for the van and his driver's license, Deputy Olson escorted Labachyan back to the patrol car, where Deputy Olson conducted a record check.

Deputy Olson asked Labachyan where the men were heading. Labachyan told Deputy Olson that he and Johnson were traveling straight through from California to East Moline, Illinois, to visit Johnson's Aunt Dorothy, who had just been discharged

-2-

from the hospital. Deputy Olson then returned to the van to speak to Johnson, whose name was on the van's rental agreement. Johnson gave a different version of the men's itinerary, stating the two planned to stop in Lincoln, Nebraska, en route to Illinois, and that they were to visit his Aunt Jeannette there.

Growing suspicious, Deputy Olson returned to his patrol car to complete his record check. During the record check, Deputy Olson discovered that Labachyan and Johnson had two months prior been stopped in a vehicle in Nebraska. During that stop, an officer had searched the vehicle and found a blowup mattress, a small amount of marijuana, and $19,000 cash sorted into three envelopes with names written on them. With no other indicia of criminal activity, the two were allowed to leave.

After learning of this incident Deputy Olson asked for and received consent from Johnson to search the van. When Johnson consented, Labachyan asked to speak with him. Deputy Olson denied the request, and along with another officer, searched the van. The officers discovered a blowup mattress, bank receipts, soiled gloves, and adult diapers. In the spare tire attached to the underside of the van, the officers found 6,000 grams of cocaine.

The district court denied Labachyan's and Johnson's respective motions to suppress the cocaine and the statements made to Deputy Olson during the traffic stop. During jury selection the government used three of its six peremptory challenges to strike all three venirepersons who were members of a minority group. The defendants raised a challenge pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), which was overruled by the court.

The jury ultimately found Labachyan and Johnson guilty of all charges, and the district court denied their motions for acquittal based on insufficiency of the evidence. This appeal followed.

## II. Discussion

We take the issues raised by defendants in the order that they were presented to the district court:  First, Labachyan's argument that his suppression motion should have been granted.  Second, Johnson's argument that his <u>Batson</u> challenge should have been sustained.  Finally, both defendants' argument that the evidence was insufficient.

### A. Suppression

When appeal is taken from the denial of a suppression motion, we review factual findings for clear error and legal conclusions *de novo*.  <u>United States v. Conant</u>, 799 F.3d 1195, 1199 (8th Cir. 2015).  We must affirm the denial "unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made."  <u>United States v. Farnell</u>, 701 F.3d 256, 260–61 (8th Cir. 2012) (quotation marks omitted).

Labachyan argues that statements he gave while seated in the patrol car during Deputy Olson's record check should be suppressed because they were elicited without a <u>Miranda</u> warning.  "[P]olice need not provide <u>Miranda</u> warnings before roadside questioning pursuant to a routine traffic stop because such questioning does not constitute 'custodial interrogation.'"  <u>United States v. Howard</u>, 532 F.3d 755, 761 (8th Cir. 2008); <u>see also</u> <u>United States v. Coleman</u>, 700 F.3d 329, 336 (8th Cir. 2012) ("Although a motorist is technically seized during a traffic stop, <u>Miranda</u> warnings are not required where the motorist is not subjected to the functional equivalent of a formal arrest." (quotation marks omitted)).  A motorist, or anyone else, is in custody for <u>Miranda</u> purposes when "his freedom of action ha[s] been curtailed to a degree associated with formal arrest, and that belief [is] reasonable from an objective

viewpoint." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (quotation marks omitted).

Deputy Olson's questioning of Labachyan did not resemble a formal arrest. Labachyan was never "informed that his detention would not be temporary," and he was asked only a "modest number of questions." United States v. Morse, 569 F.3d 882, 884 (8th Cir. 2009) (quotation marks omitted). Even if a reasonable person in Labachyan's position would not have felt free to leave, this does not amount to custody. United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003) (rejecting the "broad contention that a person is in custody for Miranda purposes whenever a reasonable person would not feel free to leave"). Neither does it matter that the motivation behind Deputy Olson's questions was to discover evidence of criminality. Berkemer v. McCarty, 468 U.S. 420, 441 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time . . . .").

A Miranda warning was not required during Deputy Olson's questioning because Labachyan was not in custody at the time. The district court did not err in denying his motion to suppress.

*B. Batson*

Batson v. Kentucky, 476 U.S. 79, 95–96 (1986), established that "even a single instance of race discrimination against a prospective juror is impermissible." Flowers v. Mississippi, 139 S. Ct. 2228, 2242 (2019). We review a district court's discharge of its duty to enforce Batson for clear error. Id. at 2244. Because "[a] finding of intentional discrimination is a finding of fact, and '[s]ince the trial judge's findings . . . largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.'" United States v. Roebke, 333 F.3d 911, 912 (2003) (quoting Batson, 476 U.S. at 98 n.21).

When a defendant challenges the government's peremptory strike pursuant to Batson, he must first make out a prima facie case that the strike was based on race. Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016). If successful, the government then may offer a race-neutral reason for its strike. Id. The defendant can then argue that this reason is mere pretext for discrimination, before the district court answers the "ultimate inquiry," namely, "whether the [government] was motivated in substantial part by discriminatory intent." Flowers, 139 S. Ct. at 2244 (quotation marks omitted). The question of motivation "involves an evaluation of the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." Snyder v. Louisiana, 552 U.S. 472, 477 (2008) (citation and quotation marks omitted). This evidence is, of course, not available to us on a paper record, which explains why these determinations of credibility and demeanor lie "peculiarly within a trial judge's province," and will only be second-guessed in "exceptional circumstances." Id. (quotation marks omitted).

The prosecutor here used three of its six peremptory challenges to strike the only three minority venirepersons. Striking all minorities from the venire is evidence that might suggest the prosecutor was motivated by discriminatory intent. See Flowers, 139 S. Ct. at 2246 ("[T]he State's decision to strike five of the six black prospective jurors is further evidence suggesting that the State was motivated in substantial part by discriminatory intent."). In this case the district court was concerned by the use of the peremptory challenges and once a Batson challenge was raised immediately shifted the inquiry to the government's race-neutral reasons for the strikes.

The first discussion related to prospective juror 24, who raised her hand when the district court asked if anyone had any life experiences that would cause them to be partial to one side during the trial. The juror explained that her partiality was based on her disagreement with a federal sentence her brother had received. Later she told the prosecutor that she had had a negative experience with law enforcement

when she was arrested for disturbing the peace. She also acknowledged her disagreement with the country's drug laws. The government cited this information in response to Johnson's <u>Batson</u> challenge of prospective juror 24, and we find no error in the district court's acceptance of these race-neutral reasons. <u>See</u> <u>United States v. Booker</u>, 576 F.3d 506, 511 (8th Cir. 2009) ("A juror's expression of past dissatisfaction with law enforcement officers, which could indicate potential bias against the prosecution, is a legitimate race neutral reason for striking prospective jurors.").

The second challenged strike related to prospective juror 1, who the government struck because of his inability to meaningfully respond to a voir dire question about the definition of reasonable doubt. Immediately prior to this question the prosecutor had offered his explanation of the reasonable-doubt standard. The prosecutor indicated he exercised a challenge as to this juror because he was worried that the juror's indefinite response to the question reflected a likely inability to understand the relevant law and ascertain the facts. While it would be unreasonable to expect a lay juror to answer a prosecutor's questions about reasonable doubt with precision, this juror's virtual non-response could cause a reasonable concern that he was unprepared to pay attention to the trial. <u>See</u> <u>United States v. Plumman</u>, 409 F.3d 919, 928 (8th Cir. 2005) (affirming denial of <u>Batson</u> challenge where a reason given for strike was that prospective juror "was unresponsive to the prosecutor's questions"). We cannot say the district court clearly erred in its determination that the prosecutor's purported reason here was not pretext for discrimination.

The third challenged peremptory strike involved prospective juror 7. The prosecutor offered the following reasons for this strike: (1) the juror rented a place where she had only been living for a month; (2) she was a single mother to a toddler; and (3) she had noted in her jury questionnaire that her "dad was killed when [she] was 2," but did not provide more information about this incident during voir dire even though the court asked if anyone had "ever been involved in any court in a criminal

matter that concerned you, any member of your family or close friend, either as a defendant, a witness, or a victim?" The prosecutor was concerned that juror 7 might be hiding a resentment of law enforcement or the criminal justice system.

These reasons are ones we have said constitute race-neutral grounds for a peremptory strike. For example, "[a]n individual's status as a renter may indicate he or she does not have substantial ties to the community," which "[w]e have found . . . to be a valid reason to exercise a peremptory strike." United States v. Adams, 604 F.3d 596, 601 (8th Cir. 2010). We have also affirmed the denial of a Batson challenge where the reason behind the allegedly unlawful strike was that the prospective juror had not been forthcoming about her family's history with law enforcement. United States v. Morrison, 594 F.3d 626, 633 (8th Cir. 2010); see also Cook v. LaMarque, 593 F.3d 810, 823 (9th Cir. 2010) (upholding denial of Batson challenge where prospective juror's "lack of candor with the court" provided part of the race-neutral reason to strike); United States v. Williams, 214 F. App'x 935, 936–37 (11th Cir. 2007) (same). Our assessment of these reasons is guided by the Supreme Court's admonition that "[a]lthough the prosecutor must present a comprehensible reason, the [law] does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." Rice v. Collins, 546 U.S. 333, 338 (2006) (quotation marks omitted).

Johnson correctly points out that the prosecutor initially misstated juror 7's level of education by telling the district court that she might just have a GED, although she had actually completed college. The prosecutor also mistakenly indicated that she had not fully completed her jury questionnaire. It is clear, however, that the prosecutor was initially speaking off the cuff without the benefit of his notes. After Johnson's counsel corrected these errors, the district court found that the prosecutor's principal reason for the strike (the mystery surrounding her father's death) was sincere and not "motivated in substantial part by discriminatory intent."

Flowers, 139 S. Ct. at 2244 (quotation marks omitted). The record before us does not demonstrate any clear error on the part of the district court.

*C. Sufficiency*

We review evidentiary sufficiency *de novo*, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Mathews, 761 F.3d 891, 893 (8th Cir. 2014) (quotation marks omitted). "The verdict will be upheld if there is any interpretation of the evidence that could lead a reasonable jury to convict." United States v. Seals, 915 F.3d 1203, 1205 (8th Cir. 2019) (quotation marks omitted).

Both defendants argue the evidence was insufficient to find beyond a reasonable doubt that they knew about the cocaine in the van's spare tire. There was evidence, however, that Labachyan was nervous during Deputy Olson's questioning, and that Labachyan expressed reservations about Deputy Olson searching the van, each an indication of a guilty conscience. See United States v. Castillo, 713 F.3d 407, 411 (8th Cir. 2013); United States v. Cortez, 935 F.2d 135, 143 (8th Cir. 1991).

Johnson, on the other hand, was calm throughout the traffic stop and authorized Deputy Olson's search. Two pieces of evidence nevertheless support a reasonable belief that Johnson knew about the cocaine. One is the presence of adult diapers in the van. The jury could have believed Deputy Olson's testimony that adult diapers are used "in the process of transporting narcotics" by those "trying to get from Point A to Point B as fast as possible." The jury could have reasonably inferred that the diapers' conspicuous presence in the van tipped Johnson off that the purpose of this trip was to haul drugs.

Other evidence tending to show Johnson's knowledge is his trip with Labachyan two months prior, when the two were stopped traveling through Nebraska in a rented van with $19,000 cash concealed in named envelopes. Johnson denied the existence of this money before its discovery, and afterward claimed (rather implausibly) that it was his life savings. See United States v. Butler, 238 F.3d 1001, 1004 (8th Cir. 2001) ("[T]he jury could have inferred guilty knowledge from defendant's unlikely story." (quotation marks omitted)). A reasonable inference from this evidence is that Johnson and Labachyan had been moving drugs on that drive too and that drug runs were a routine for Labachyan and Johnson, belying either's ignorance of the presence of cocaine in this case. Cf. United States v. Willis, 89 F.3d 1371, 1377 (8th Cir. 1996) ("Scratch marks on the caps to the holes in the wheel wells in the cargo area of the [car], along with the screwdriver, support an inference by the jury that [the defendant] had transported drugs in the past and knew about the presence of the crack in the present case.").

The evidence was sufficient for a reasonable jury to find both Labachyan and Johnson guilty beyond a reasonable doubt.

## III. Conclusion

We affirm the district court's judgment in both cases.

KELLY, Circuit Judge, concurring.

I concur in the court's opinion but write separately as to the peremptory strike used against Juror 7. In my view, the government's use of a peremptory challenge to strike Juror 7 presents a close call. At voir dire, the government pointed out that Juror 7 rented her home, had only been at her address for one month,[1] and was a

_____

[1] Like all eligible venire members, Juror 7 had lived in Nebraska for at least one

single[2] mother. While we have said that the "absence of community attachment" is a race-neutral reason for striking a potential juror, see United States v. Maxwell, 473 F.3d 868, 872 (8th Cir. 2007), the government did not articulate a concern that Juror 7 lacked community attachment. Instead, the government said that jury service would be a "big burden" for Juror 7. But the district court had asked all of the jurors: *Do any of you have any other reason which you think constitutes undue hardship or extreme inconvenience sufficient to justify my excusing you from jury service this week?* Juror 7 did not respond to the court's question with any such hardship or inconvenience. Indeed, no one did. All the jurors were under oath, and we must presume they honored that oath during questioning.

I also question whether it is reasonable to infer that a person who is working a full-time job and raising a child would suffer an unusual burden. Those circumstances do not appear to be out of the ordinary. The district court made it clear that it intended to end court by 4:30 p.m. each day "because of a variety of factors, day care needs and things like that." The government did not clarify what it meant by "big burden," but if it was childcare, that concern had already been addressed by the court. It is unclear, on this record, how the characteristics identified by the government reflected Juror 7's eligibility and willingness to serve on a jury.

In any event, the government stated that, "more importantly," the strike was warranted because it was concerned that Juror 7 had not offered additional information about an answer she gave to one of the questions on the supplemental questionnaire: *Have you or a close family member ever been a victim of a crime? If so, please describe the circumstances.* Juror 7 wrote: *yes. My dad was killed when*

year.

[2]The questionnaire does not ask directly for marital status, asking instead "*What is your spouse's occupation, if any?*" Juror 7 wrote, "n/a" and the government assumed this meant she was single.

-11-

*i was 2.* The government's concern was that Juror 7 did not raise her hand in response to a similar question the court asked during the early part of voir dire: *Have any of you ever been involved in any court in a criminal matter that concerned you, any member of your family or close friend, either as a defendant, a witness, or a victim?* But Juror 7 was two years old when her father was killed. And the court's question asked whether the *potential juror* was *involved* in any such criminal matter. It is entirely reasonable—and expected—that a truthful answer to that question for someone with Juror 7's experience would be "no."

Moreover, even if this is a race-neutral reason for striking Juror 7, the government did not move to strike another juror who was in an analogous situation. In response to the same written question on the supplemental questionnaire, Juror 17 said: *Yes, sexual assault, charges never pressed, statute of limitations has expired.* Juror 17, like Juror 7, did not respond when the court asked whether anyone had "ever been involved in any court in a criminal matter." To justify its striking Juror 7, the government expressed concern that Juror 7 didn't "mention it at all," despite the opportunities to talk about "being a victim of a crime and how you feel about the criminal justice system." The government complained that Juror 7 "just sat back there, didn't answer one question, didn't raise her hand once." This description, however, applies equally to Juror 17. In other words, as to this "more important[]" factor, Juror 17 responded (or didn't respond) in an identical fashion to Juror 7. Yet Juror 17, who was not a racial minority, was seated on the jury, whereas Juror 7, whom the parties identified as African-American, was struck by the government's use of a peremptory challenge.[3] See Davidson v. Harris, 30 F.3d 963, 965 (8th Cir. 1994) ("A party can establish an otherwise neutral explanation is pretextual by showing that

---

[3]One of the venire members did not answer <u>any</u> of the questions on the supplemental questionnaire, including the question at issue here: *Have you or a close family member ever been a victim of a crime? If yes, please describe the case.* This person was seated on the jury.

the characteristics of a stricken black panel member are shared by white panel members who were not stricken.")

"Discrimination in jury selection, whether based on race or gender, causes harm to litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 140 (1994). Jury selection can be difficult, particularly when potential jurors are reluctant to speak openly or are hesitant to offer information until questions are directed specifically at them. Yet voir dire gives counsel the opportunity to do just that: ask questions. And the process would be better served when both parties remain conscientious about asking questions of jurors when they have questions they want answered. See, e.g., United States v. Hampton, 887 F.3d 339, 343 (8th Cir. 2018) ("Active engagement with potential jurors—by district courts, the government, and defense counsel—better informs the use of peremptory challenges by all parties"); United States v. Grant, 563 F.3d 385, 391–92 (8th Cir. 2009) (district court did not clearly err in concluding that counsel's explanations for striking three female jurors were pretextual, in part because each juror was not asked any questions during voir dire). "Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial." Batson v. Kentucky, 476 U.S. 79, 87 (1986). The best way to determine that impartiality is to engage in a conversation with the potential jurors themselves.

In this case, the district court expressly found that the government "met its burden" in stating "a legitimate nondiscriminatory reason for making [the] strike." The defendant argued the government's reasons were inadequate but, critically, did not argue they were pretextual. We defer to the district court's findings on this question, reviewing only for clear error, and understanding that the district court is in the best position to make what can be a difficult call. See United States v. Arnold, 835 F.3d 833, 841 (8th Cir. 2016); United States v. Ellison, 616 F.3d 829, 832 (8th Cir. 2010) (because the district court's factual findings on a Batson issue "turn largely

-13-

on credibility evaluations, they are due great deference, and our review is for clear error" (cleaned up)).  Given that deference, and despite my misgivings about the extent of the record on the issue, I cannot say the district court clearly erred in its findings.  <u>See</u> <u>United States v. Carr</u>, 67 F.3d 171, 175–76 (8th Cir. 1995) (where the non-moving party made no attempt to show pretext, the district court did not err in concluding the strike was race-neutral).

_____