******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* JOSE A. B.*
## (SC 20332)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of sexual assault in the first degree, attempt to commit sexual assault in the first degree, sexual assault in the fourth degree, and two counts of risk of injury to a child, the defendant appealed, claiming that the trial court improperly had overruled defense counsel's objections to the prosecutor's use of peremptory challenges to excuse two prospective jurors, C and N, and that his conviction of two counts of risk of injury to a child violated the constitutional prohibition against double jeopardy. C is an African-American, and N is also a member of a racial minority. The prosecutor had explained that the basis for the peremptory challenges to C and N was their stated distrust of law enforcement and/or the criminal justice system. Specifically, the prosecutor relied on N's statements during voir dire indicating that she previously had been convicted of a crime for which she received a pardon, that she had resented the police at the time she was arrested but no longer felt that way, and that her husband's friend had previously pleaded guilty to sexual assault but that she did not believe the truth of the allegations against him. With respect to C, the prosecutor relied on the fact that, although C had disclosed an incident involving a larceny on his juror questionnaire, he also revealed during voir dire an undisclosed conviction resulting from an assault of a police officer, for which C believed he was unfairly prosecuted. Defense counsel objected to the peremptory challenges on the basis of the United States Supreme Court's decision in *Batson* v. *Kentucky* (476 U.S. 79), which prohibits a party from challenging prospective jurors solely on account of their race. The trial court overruled the *Batson* challenges, concluding that the reasons proffered by the prosecutor, namely, N's resentment toward the police and her criminal conviction resulting in a pardon, as well as C's prior arrest for a serious crime for which he believed he was unfairly prosecuted, were race neutral and not a pretext for discrimination. From the judgment of conviction, the defendant appealed. *Held*:

1. The trial court did not commit clear error in determining that the defendant had failed to meet his burden of proving, by a preponderance of the evidence, that the jury selection process in the present case was tainted by purposeful discrimination:

a. The defendant conceded that the distrust of law enforcement and/or the criminal justice system is a race neutral reason for exercising a peremptory challenge under federal constitutional law, and this court declined to conclude, on the basis of the record in the present case, that such negative perceptions constitute a facially discriminatory reason for exercising a peremptory challenge under the Connecticut constitution: although neither the text nor the history of the relevant provisions (article I, §§ 1, 8, 19 and 20, as amended) of the Connecticut constitution shed any light on the scope of permissible reasons for peremptory challenges, federal precedent provided no support for the defendant's claim, and sister state precedent did not provide overwhelming support for that claim, this court's recent decision in *State* v. *Holmes* (334 Conn. 202) signaled a shift in this state's precedent toward ensuring the impartiality of juries by addressing the problems of implicit bias and disparate impact during jury selection; moreover, in *Holmes*, this court recognized that significant public policy and sociological reasons support the conclusion that a negative perception of law enforcement is not a race neutral reason for excluding a prospective juror, considering the disparate impact those reasons have on racial minorities and, to that end, announced in that case the creation of the Jury Selection Task Force to study and propose changes to the jury selection process in Connecticut that would remediate the issue of racial discrimination and implicit bias in jury selection; nonetheless, principles of judicial restraint counseled against this court's making a new constitutional pronouncement on this issue, as the Jury

Selection Task Force recently had proposed a new rule of practice to address these concerns, the proposed rule had been submitted to the judges of the Superior Court for consideration, and the rule-making process was ongoing; accordingly, this court declined to hold in the present case that greater protection was warranted under the Connecticut constitution than is provided under the existing federal *Batson* scheme.

b. The trial court's finding that the reasons proffered by the prosecutor for peremptorily challenging C and N were not a pretext for impermissible discrimination was not clearly erroneous; the record indicated that the prosecutor questioned all of the prospective jurors in a similar manner as to whether they, or someone close to them, had ever been arrested or charged with a crime, any affirmative responses to those questions were followed by questions regarding the details of any arrest or charge and whether it would influence the prospective juror, the more extensive questioning of C with regard to his criminal history was reflective of the incomplete answers that he provided in his questionnaire and during voir dire rather than reflective of a racially discriminatory intent, and there was no evidence of a pattern of discrimination by the prosecutor in excluding prospective jurors of a particular race.

2. The defendant could not prevail on his claim that his right to be free from double jeopardy was violated because risk of injury to a child, with which the defendant was charged, is a lesser included offense of sexual assault in the first degree and sexual assault in the fourth degree: even if it was assumed that the offenses in question arose from the same act or transaction, the defendant failed to show that those crimes constituted the same offense for double jeopardy purposes under the test set forth in *Blockburger* v. *United States* (284 U.S. 299), and this court, in a recently decided case, *State* v. *Tinsley* (340 Conn. 425), rejected the defendant's argument that, notwithstanding the distinct elements of each offense charged, a court should consider the facts alleged in the information when determining whether the statutory elements of each offense are the same under *Blockburger*; in the present case, the crimes of sexual assault in the first degree and sexual assault in the fourth degree each required proof of a fact that risk of injury to a child did not, as sexual assault in the first degree required proof that the defendant engaged in sexual intercourse with the victim and was more than two years older than the victim, sexual assault in the fourth degree required proof that the defendant intentionally subjected someone under the age of fifteen to sexual contact, and the particular risk of injury offenses of which the defendant was convicted required proof of neither of those facts; moreover, because the defendant did not argue that that the legislature had intended that risk of injury to a child, on the one hand, and sexual assault in the first or fourth degree, on the other, should be considered the same offense, he could not rebut the presumption that those crimes did not constitute the same offense under *Blockburger*.

Argued February 26, 2021—officially released March 22, 2022

*Procedural History*

Substitute information charging the defendant with two counts of the crime of risk of injury to a child, and with one count each of the crimes of sexual assault in the first degree, attempt to commit sexual assault in the first degree, and sexual assault in the fourth degree, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Doyle, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Drew J. Cunningham*, with whom was *Damian K. Gunningsmith*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Elena Ricci Palermo*, senior assistant state's attorney, for the appellee (state).

*Harry Weller*, *Peter T. Zarella*, and *C. Ian McLachlan* filed a brief as amici curiae.

*Alinor C. Sterling* and *James J. Healy* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*George Welch*, human rights attorney, filed a brief for the Commission on Human Rights and Opportunities as amicus curiae.

*Tadhg Dooley* filed a brief for Professors and Research Scholars at Connecticut's Law Schools as amici curiae.

*William Tong*, attorney general, *Clare Kindall*, solicitor general, and *Joshua Perry*, special counsel for civil rights, filed a brief for the Office of the Attorney General as amicus curiae.

*Christine Perra Rapillo*, chief public defender, and *Adele V. Patterson*, senior assistant public defender, filed a brief for the Office of the Chief Public Defender as amicus curiae.

*David N. Rosen* filed a brief as amicus curiae.

*Georgina Yeomans* filed a brief for NAACP Legal Defense and Educational Fund, Inc., as amicus curiae.

*Opinion*

ROBINSON, C. J. The principal issue in this appeal asks us to revisit our recent decision in *State* v. *Holmes*, 334 Conn. 202, 221 A.3d 407 (2019), and to consider whether, given the disparate impact on minority communities, a prospective juror's negative experience with, or distrust of, the criminal justice system provides a race neutral reason for the exercise of a peremptory challenge under the Connecticut constitution. The defendant, Jose A. B., appeals[1] from the judgment of conviction, rendered after a jury trial, of three counts of sexual assault or attempt to commit sexual assault and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[2] On appeal, the defendant claims that (1) the trial court improperly overruled his *Batson*[3] objection to the prosecutor's exercise of peremptory challenges to two venirepersons, and (2) his conviction of two counts of risk of injury to a child violates his right to be free from double jeopardy. We disagree, and, accordingly, we affirm the judgment of the trial court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural history. The victim lived with the defendant, the defendant's wife, who was the victim's legal guardian, and the victim's brother, from the time the victim was eighteen months old. The victim testified that the defendant sexually assaulted her on numerous occasions between 2000 and 2007, when she was between five and twelve years old.[4]

The state subsequently charged the defendant with sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2),[5] sexual assault in the fourth degree in violation of General Statutes (Rev. to 2001) § 53a-73a (a) (1) (A),[6] attempt to commit sexual assault in the first degree in violation of § 53a-70 (a) (2) and General Statutes § 53a-49 (a) (2),[7] and two counts of risk of injury to a child in violation of § 53-21 (a) (2). The case was tried to a jury, which found the defendant guilty on all counts. The trial court rendered a judgment of conviction in accordance with the jury's verdict, sentenced the defendant to a total effective sentence of seventeen years of imprisonment, followed by two years of special parole, issued a criminal protective order and ordered sexual offender registration. This direct appeal followed.[8] Additional relevant facts and procedural history will be set forth in the context of each claim on appeal.

I

JURY SELECTION CLAIMS

The defendant first claims that his state and federal constitutional rights were violated because the state's peremptory challenges to two venirepersons, N.L. and C.J.,[9] during jury selection violated *Batson* v. *Kentucky*,

476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The record reveals the following additional facts and procedural history relevant to this claim.

During the prosecutor's voir dire examination of N.L., the following exchange occurred:

"[The Prosecutor]: Do you know of anyone who has ever been accused of a sexual assault besides the one you just told us about?

"[N.L.]: Yes.

"[The Prosecutor]: Tell me a little bit about that.

"[N.L.]: Well, he was actually a friend of my husband's. He used to date this girl, and they had kids together, but she had a son with someone else, and she didn't have custody of him. The grandparents did. And I guess maybe he wanted to, you know, live with them, and the person got accused of sexually molesting him. . . . I don't know if it happened. And he went to jail, but he's been out of jail for a long time.[10]

* * *

"[The Prosecutor]: Do you think that people [who] are victims of sexual assault should go to the police?

"[N.L.]: Yes.

* * *

"[The Prosecutor]: Now, have you or anyone close to you, besides what you told us, ever been charged or arrested for a crime?

"[N.L.]: Myself, I have.

"[The Prosecutor]: Can you tell me a little bit about that?

"[N.L.]: Yeah. It's years ago. I've actually had a pardon. So I don't know if I should talk about it.

"The Court: If you have a pardon—I guess the question would be, is there anything about that experience that might affect your ability to be fair and impartial in this case?

"[N.L.]: I don't think so.

"[The Prosecutor]: You're hesitating a little.

"[N.L.]: No, I don't think so. I think I can separate the two.[11]

* * *

"[The Prosecutor]: Do you think that the fact that you were arrested and then later pardoned, do you think that might make you think you might lean more toward the defense in this case?

"[N.L.]: Not based on that. I would actually have to hear both sides. Then I can make a decision from there.

"[The Prosecutor]: Do you think you would hold it

against the state because of what happened?

"[N.L.]: No.

* * *

"[The Prosecutor]: All right. There will . . . probably [be] testimony from at least one police officer in this case. What's your feeling about the police in general?

"[N.L.]: Well, I ha[d] a lot of resentment when I got arrested, but, over time, I've learned that whatever happened was not their fault. It was something that I did. And I actually have members that are police officers.

"[The Prosecutor]: Members of [your] family?

"[N.L.]: Mm-hmm.

* * *

"[The Prosecutor]: So, you held a lot of resentment at one time for the police. And now?

"[N.L.]: No.

"[The Prosecutor]: Have you ever had to call the police yourself for any reason?

"[N.L.]: Yeah.

"[The Prosecutor]: For what?

"[N.L.]: Domestic, when I was like real young." (Footnotes added.)

Upon conclusion of the voir dire examination of N.L., the prosecutor exercised a peremptory challenge. The prosecutor stated, inter alia, that N.L.'s articulated resentment toward the police and her criminal history of a conviction resulting in a pardon warranted the use of a peremptory challenge.[12] Defense counsel then raised a *Batson* objection to the state's peremptory challenge of N.L. The trial court overruled defense counsel's *Batson* objection, concluding that the prosecutor's proffered reasons for the peremptory challenge of N.L. were race neutral and not a pretext for discrimination.[13]

The prosecutor subsequently conducted a voir dire examination of C.J., during which they discussed C.J.'s arrest history, which C.J. had only partially disclosed in his juror questionnaire:

"[The Prosecutor]: Have you or anyone close to you ever been arrested for any kind of crime?

"[C.J.]: I have been arrested for a crime.

"[The Prosecutor]: For what, sir?

"[C.J.]: Well, a long time ago, coming out [of] my aunt's building, an undercover police officer grabbed my arm, and I'm thinking it's a robbery, so I swung to get him off of me, but then that—then everything took place. Then I find out he was a police officer.

"[The Prosecutor]: Okay. So you were arrested for that?

"[C.J.]: Yes.[14]

\* \* \*

"[The Prosecutor]: You gave a little information on your juror questionnaire, and you . . . put down something about larceny six, but dropped from my job. . . . What's that mean?

"[C.J.]: . . . I worked at Stop and Shop for almost twelve years. All right. We had a hectic night one night. I had my stuff in a carriage, and I was the key holder, so, when I was leaving . . . I grabbed my carriage, but . . . because of the night, I didn't scan those things out, so they put a larceny six, but they dropped it—all that. But that was in 2011.[15]

\* \* \*

"[The Prosecutor]: Okay. Besides that, any other time you or anyone else close to you [has] ever been arrested?

"[C.J.]: No." (Footnotes added.)

The state then questioned C.J. regarding his attitude toward the police and the criminal justice system:

"[The Prosecutor]: Do you think the fact that you have been arrested and [that] you've kind of dealt with the criminal justice system, do you think that might play a part in your deliberations if you're a juror?

"[C.J.]: Not really.

"[The Prosecutor]: What do you mean?

"[C.J.]: Because, at the end of the day, all these offense[s] you [are] talking about happened over thirty years ago.

"[The Prosecutor]: Okay. . . . The fact that you were arrested [for] the larceny six that ended up getting dropped. Do you think that you might hold a grudge against the state because of your background?

"[C.J.]: No.

"[The Prosecutor]: Do you think you were fairly prosecuted?

"[C.J.]: Do I think I was fairly prosecuted? Not on the first one, no.

"[The Prosecutor]: No? That was the one with the—

"[C.J.]: The assault—

"[The Prosecutor]: —assault?

"[C.J.]: —on the police officer.

"[The Prosecutor]: And that was in Hartford?

"[C.J.]: That was in Hartford. . . .

"[The Prosecutor]: What's your opinion of the police?

"[C.J.]: I don't have no opinions on [the] police

because, in my whole family, there's massive police officers. Chief of police was my uncle, so I don't have [an] opinion on none of them. There's good police, and there's bad police, so I don't have an opinion on that. I treat people as individuals.''

The prosecutor first moved to excuse C.J. for cause, given his failure to account completely for his past convictions in his questionnaire by omitting his arrest for assaulting a police officer. Defense counsel objected to the challenge for cause, arguing that C.J.'s recollection had been affected by the length of time that had passed since his arrest. The trial court agreed with defense counsel and denied the state's challenge for cause. The prosecutor then exercised a peremptory challenge, arguing that, in addition to C.J.'s apparent omissions in completing the questionnaire, the charge of assaulting a police officer itself was serious in nature and that C.J. believed that he had been incorrectly and unfairly prosecuted in that instance. In response, defense counsel raised a *Batson* objection. The court overruled the *Batson* objection, finding that "an objectively neutral reason [for the peremptory challenge] would be the fact that he was previously arrested [and] charged with a serious crime, even though it was a long time ago, [and that] he felt he was not fairly treated." The trial court also found that the prosecutor's race neutral reason was not a pretext for discrimination.[16]

Before addressing the defendant's claims in detail, we review the well established general principles under which we consider *Batson* claims. "Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . . . Our constitutional and statutory law permit[s] each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine [his or her] fitness to serve on the jury. . . . Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is in the [prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. . . .

"Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as one [state created] means to the constitutional end of an impartial jury and a fair trial. . . . [S]uch challenges generally may be based on subjective as well as objective criteria . . . .

Nevertheless, [i]n *Batson* [v. *Kentucky*, supra, 476 U.S. 79] . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the [e]qual [p]rotection [c]lause forbids [a party] to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, a *Batson* inquiry involves three steps.[17] First, a party must assert a *Batson* claim . . . . [Second] the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the [e]qual [p]rotection [c]lause as a matter of law. . . . At this stage, the court does not evaluate the persuasiveness or plausibility of the proffered explanation but, rather, determines only its facial validity—that is, whether the reason on its face, is based on something other than the race of the juror. . . . Thus, even if the [s]tate produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three. . . .

"In the third step, the burden shifts to the party asserting the *Batson* objection to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual." (Footnote altered; footnote omitted; internal quotation marks omitted.) *State* v. *Holmes*, supra, 334 Conn. 222–24; see, e.g., *State* v. *Edwards*, 314 Conn. 465, 483–85, 102 A.3d 52 (2014).

It is undisputed that the defendant has satisfied the first step of the *Batson* inquiry as to N.L. and C.J. See footnote 9 of this opinion. Turning, then, to the second step of the *Batson* inquiry, we must determine whether the prosecutor's proffered reason for the peremptory challenges, namely, a prospective juror's distrust of the criminal justice system based on his or her personal experience, was facially race neutral. This is a question of law, over which we exercise plenary review. See, e.g., *State* v. *Holmes*, supra, 334 Conn. 226.

The defendant first argues that, as a matter of Connecticut constitutional law, the prosecutor's proffered reasons for the peremptory challenges were facially discriminatory based on race, given their disparate impact on members of minority groups.[18] We address this argument under the state constitution before turning to the third step of the *Batson* inquiry, namely, the

defendant's alternative claim that, even if race neutral, any proffered reason by the prosecutor was a pretext for purposeful discrimination.

### A

### State Constitutional Claim as to the Second Prong of the *Batson* Inquiry

The defendant claims that certain provisions of the Connecticut constitution, namely, §§ 1, 8, 19 and 20 of article first, as amended,[19] provide broader protection than does the federal constitution with respect to the exercise of peremptory challenges and the right to an impartial jury. The defendant contends, therefore, that our state constitution prohibits the exercise of peremptory challenges based on a venireperson's distrust of the criminal justice system or law enforcement.[20] In response, the state argues that an absolute bar to challenging any venireperson who expresses distrust in the criminal justice system presents an unworkable approach that is not supported by the text of the applicable state constitutional provisions. The state further argues that we should exercise decisional restraint in light of the recent findings and recommendations of the Jury Selection Task Force (Task Force), including the Task Force's proposed change to the rules of practice, which was pending before the Rules Committee of the Superior Court (Rules Committee) when this appeal was argued and has since been submitted for a public hearing before the judges of the Superior Court. Although the defendant's arguments are compelling in light of recent case law and research concerning the effect of implicit bias, we nevertheless agree with the state that restraint is warranted at this time with respect to the adjudication of this issue as a matter of state constitutional law.

In determining that our state constitution in some instances provides greater protection than that provided by the federal constitution, "we have recognized that [i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution— we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155–56, 957 A.2d 407 (2008).

"In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we enumerated the following six factors to be considered in construing the state constitution: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary

understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. . . .

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party . . . can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [N]ot every *Geisler* factor is relevant in all cases. . . . Moreover, a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of those decisions' underpinnings is required because we follow only persuasive decisions. . . . The *Geisler* analysis applies to cases in which the state constitution has no federal analogue, as well as those in which the claim is that the state constitution provides greater protection than does the federal constitution." (Citations omitted; internal quotation marks omitted.) *Fay* v. *Merrill*, 338 Conn. 1, 26–27, 256 A.3d 622 (2021); see, e.g., *Feehan* v. *Marcone*, 331 Conn. 436, 449, 204 A.3d 666, cert. denied,      U.S.    , 140 S. Ct. 144, 205 L. Ed. 2d 35 (2019).

1

### Constitutional Language

We begin with the first *Geisler* factor, namely, the relevant constitutional text. See, e.g., *Feehan* v. *Marcone*, supra, 331 Conn. 450–51; *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 409–10, 119 A.3d 462 (2015). Article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides in relevant part: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law . . . . In all civil and criminal actions tried by a jury, *the parties shall have the right to challenge jurors peremptorily*, the number of such challenges to be established by law. *The right to question each juror individually by counsel shall be inviolate*." (Emphasis added.) We conclude that this *Geisler* factor does not favor either party because "this generally phrased constitutional language is at best ambiguous with respect to the constitutional issue presented in this appeal." *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 409; see id., 409–10 (concluding that " 'without . . . delay' " language in article first, § 10, was ambiguous as to whether undue delay in administration of justice is unconstitutional).

The defendant argues that, because article first, § 19, of the Connecticut constitution, unlike the applicable provisions of the federal constitution that govern crimi-

nal jury trials,[21] specifically references the right to peremptory challenges, a more expansive right to an inclusive jury is available under the state constitution. We agree with the defendant that Connecticut's constitution provides an express right to peremptory challenges, which the federal constitution does not guarantee, and that "[j]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8 . . . ." (Footnote omitted; internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 46, 726 A.2d 513 (1999). However, even when read in the context of the state constitution's equal protection clause; see Conn. Const. art. I, § 20; the plain language of article first, § 19, sheds no light on the scope of permissible reasons for peremptory challenges under the state constitution; its breadth could also be understood *not* to warrant additional restrictions on a litigant's exercise of that right to exercise peremptory challenges. Put differently, the text of the applicable provisions of the Connecticut constitution does not provide guidance as to whether particular reasons for peremptory challenges are constitutional and, therefore, neutral with respect to whether distrust of law enforcement or the criminal justice system is a constitutionally valid, race neutral reason for the exercise of a peremptory challenge. Accordingly, with the text being not dispositive, we continue with our review of the other *Geisler* factors. See, e.g., *Fay* v. *Merrill*, supra, 338 Conn. 36.

2

Constitutional History

Neither party has cited any historical source that discusses negative perceptions of the criminal justice system or law enforcement as an unconstitutionally discriminatory ground on which to base a peremptory challenge. Although it is of limited value to our inquiry in this case, we now briefly consider the history of voir dire and peremptory challenges under the Connecticut constitution generally. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 410–11. The right to a trial by jury was established in Connecticut as early as 1636. See W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 90. "Prior to the adoption of the fourth amendment to Connecticut's constitution, article first, § 19 provided only that '[t]he right of trial by jury shall remain inviolate.' In 1971, in response to the increasing congestion of court dockets and mounting court costs, the legislature proposed a constitutional amendment to permit mandatory [six person] juries in place of [twelve person] juries in certain circumstances. . . . In order to preserve what the legislature perceived as the fundamental character of jury trials, however, the proposed amendment contained two provisions guaranteeing that parties would continue to have certain rights, previously granted only by statute, regarding

the selection of individual jurors. As adopted by the electors of Connecticut in 1972, the amendment constitutionalized the right of the parties 'to challenge jurors peremptorily' and the right 'to question each juror individually by counsel.' " (Citations omitted; footnote omitted.) *Rozbicki* v. *Huybrechts*, 218 Conn. 386, 391–92, 589 A.2d 363 (1991). This amendment, however, predated the United States Supreme Court's decision in *Batson* by fourteen years.

"The purpose and effect of [article first, §§ 8 and 19] is to preserve . . . as a political right the institution of jury trial, *in all its essential features as derived from our ancestors and* [*existent*] *by force of our common law*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 694, 741 A.2d 913 (1999). A discussion by Chief Justice Zephaniah Swift, written in 1822, describes the ways in which an impartial jury may be secured and demonstrates that such challenges to venirepersons were intended to exclude jurors with bias, including bias resulting from favor or enmity toward either party: "Challenges to the polls, or to particular jurors, are [1], the want of qualifications, [2] for crimes, and [3] for partiality. . . .

"[3] A juror may be challenged for suspicion of bias, or partiality, which may be either a principal challenge, or a challenge to the favour.

\* \* \*

"Challenges to the favour, are founded merely on probable circumstances of suspicion, as *particular friendship or enmity to either of the parties*: and where the court has reason to think that there is such a bias or prejudice on the mind of a juror, as renders it probable there will not be a candid and fair trial, they have a discretionary power to dismiss him . . . but they ought not to indulge any unreasonable and groundless suspicion of the party." (Emphasis added; footnotes omitted.) 1 Z. Swift, A Digest of the Laws of the State of Connecticut (1822) pp. 737–38; accord *State* v. *Griffin*, supra, 251 Conn. 693–94. Although Chief Justice Swift's discussion is interesting to the extent that he observes that contemplated sources of unwanted bias, justifying exclusion of a juror from service, could well include enmity toward a party to the case, the value of his insights with respect to the *Batson* inquiry in this case is ultimately diminished by the fact that, in his time, only landowning males were qualified to serve as jurors. See 1 Z. Swift, supra, p. 737. Thus, historical insights into the intentions of our constitutional forebears are not particularly instructive with respect to the defendant's state constitutional claim.

Federal Precedent

Federal precedent does not support the defendant's claim with respect to the disparate impact of a peremp-

tory challenge based on a prospective juror's distrust of law enforcement and the criminal justice system. "In *Hernandez* [v. *New York*, 500 U.S. 352, 362–63, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)], the United States Supreme Court concluded that a prosecutor had not violated *Batson* by using peremptory challenges to exclude Latino jurors by reason of their ethnicity when he offered as a race neutral explanation his concern that bilingual jurors might have difficulty accepting the court interpreter's official translation of multiple witnesses' testimony given in Spanish. . . . In so concluding, the Supreme Court rejected the argument that the prosecutor's reasons, if assumed to be true, were not race neutral and thus violated the equal protection clause as a matter of law because of their disproportionate impact on Latino jurors." (Citation omitted.) *State* v. *Holmes*, supra, 334 Conn. 228. "[T]he only post-*Hernandez* cases we have located on [whether distrust of law enforcement or the criminal justice system is not a race neutral reason under *Batson* for exercising a peremptory challenge] have expressly rejected this disparate impact argument."[22] Id., 231–32. Moreover, the defendant has not cited any concurrences, dissents, or other federal authority on point. Therefore, this *Geisler* factor does not support the defendant's state constitutional claim.

4

Connecticut Precedent

The defendant begins his analysis of Connecticut precedent with well established case law from this court construing the due process protections under article first, § 8, of the Connecticut constitution not to impose the same meaning and limitations as its federal counterpart. See, e.g., *State* v. *Morales*, 232 Conn. 707, 717–18, 657 A.2d 585 (1995). He then contends that we should extend a greater state constitutional protection against racial bias in the exercise of peremptory challenges. Although we agree with the defendant that our state constitution affords greater protections to peremptory challenges than is provided by the federal constitution, that does not—without more—resolve the question of whether particular reasons for striking jurors are race neutral as a matter of state constitutional law.

As the defendant acknowledges, a line of Connecticut cases has addressed whether a prosecutor's reason for a peremptory challenge is race neutral if there is a disparate impact on jurors of a certain racial group. For instance, in *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992), this court recognized that prosecutors commonly seek to exclude from juries those individuals who have had negative interactions with law enforcement "because they fear that such people will be biased against the government." The court "decline[d] to ascribe a racial animus to the state's excusal of a

venireperson with an arrest record simply because that venireperson was [B]lack." Id.; see *State* v. *King*, 249 Conn. 645, 666, 735 A.2d 267 (1999) (prosecutor's reasons for striking venireperson were "not motivated by discriminatory considerations" because "it was reasonable for the prosecutor to conclude that [the prospective juror's] concerns about the fairness of the criminal justice system might make it difficult for him to view the state's case with complete objectivity"); *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531 (venireperson's past experiences with law enforcement and perception that family had been treated unfairly were race neutral reasons for state to exercise peremptory challenge), cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); *State* v. *Jackson*, 73 Conn. App. 338, 350–51, 808 A.2d 388 (rejecting defendant's disproportionate impact argument against prosecutor's race neutral explanations), cert. denied, 262 Conn. 929, 814 A.2d 381 (2002), and cert. denied, 262 Conn. 930, 814 A.2d 381 (2002); *State* v. *Morales*, 71 Conn. App. 790, 807, 804 A.2d 902 (prospective juror's "negative opinion concerning police performance" was valid, nondiscriminatory reason for peremptory challenge), cert. denied, 262 Conn. 902, 810 A.2d 270 (2002).

Beyond this line of cases, this court has previously held—in a decision that the defendant asks us to overrule—that there is "nothing in the language of article first, § 8, to suggest that the meaning of the term 'impartial jury' in our state constitution is different from the meaning of that same term in the federal constitution—namely, a jury that is: (1) composed of individuals able to decide the case solely on the evidence and [to] apply the law in accordance with the court's instructions; and (2) properly selected from venire panels comprising a representative cross section of the community." *State* v. *Griffin*, supra, 251 Conn. 691–92; see id., 708–709 ("the death qualification process" does not violate capital defendant's state constitutional right to impartial jury). Moreover, in discussing the purpose of voir dire leading to a challenge for cause or peremptory challenge, we have observed that, especially with respect to criminal defendants, "[i]f there is any likelihood that some prejudice is in the juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice." (Internal quotation marks omitted.) Id., 698–99.

In asking us to overrule or limit this line of cases, the defendant relies heavily on criticisms, in recent opinions of this court and the Appellate Court, of the adequacy of *Batson* as a remedy for disparate impact and implicit bias within the jury selection process.[23] In *Holmes*, we recently stated that, "[a]lthough *Batson* has serious shortcomings with respect to addressing the effects of disparate impact and unconscious bias, we decline to throw up our hands in despair at what

appears to be an intractable problem. Instead, we should recognize the challenge presented by unconscious stereotyping in jury selection and rise to meet it." (Internal quotation marks omitted.) *State* v. *Holmes*, supra, 334 Conn. 245; see also *State* v. *Holmes*, 176 Conn. App. 156, 192–93, 169 A.3d 264 (2017) (*Lavine, J.*, concurring) (urging reform of *Batson* procedures "because this case brings into sharp relief a serious flaw in the way *Batson* has been, and can be, applied," which "must be remedied if the jury selection process is to attain the goal of producing juries representing all of the communities in our state and gaining their confidence and trust"), aff'd, 334 Conn. 202, 221 A.3d 407 (2019). We then announced the creation of the Task Force, to be appointed by the Chief Justice; *State* v. *Holmes*, supra, 334 Conn. 250; anticipating that it would "propose meaningful changes to be implemented via court rule or legislation, including, but not limited to (1) proposing any necessary changes to General Statutes § 51-232 (c),[24] which governs the confirmation form and questionnaire provided to prospective jurors, (2) improving the process by which we summon prospective jurors in order to ensure that venires are drawn from a fair cross section of the community that is representative of its diversity, (3) drafting model jury instructions about implicit bias, and (4) promulgating new substantive standards that would eliminate *Batson*'s requirement of purposeful discrimination." (Footnote in original.) Id., 251–52.

Notwithstanding past precedent in this state rejecting disparate impact arguments in the context of jury selection, we conclude that the state precedent factor has recently shifted in light of this court's resolve in *Holmes* to ensure the impartiality of juries by addressing the problems of implicit bias and disparate impact during jury selection. Our recent criticism of the shortcomings of the *Batson* process in *Holmes*, with concrete action taken by the formation of the Task Force, supports the conclusion that Connecticut's case law has squarely identified the ineffectiveness of *Batson* in addressing the effects of implicit bias and disparate impact on the rights of members of minority communities during the jury selection process. This concern remains salient, notwithstanding our conclusion in part I B of this opinion that the prosecutor's reasons for the peremptory challenges at issue in this case were not a pretext for racial discrimination.

### 5

### Sister State Precedent

The defendant does not cite any sister state court decision that has held, as a matter of state constitutional law, that a negative perception of law enforcement or the criminal justice system is a facially discriminatory reason to exclude a venireperson under the second step of *Batson*. Indeed, a review of sister state court

decisions reveals the opposite. See *People* v. *Hardy*, 5 Cal. 5th 56, 81, 418 P.3d 309, 233 Cal. Rptr. 3d 378 (2018) ("[a] prospective juror's distrust of the criminal justice system is a [race neutral] basis for his excusal" (internal quotation marks omitted)), cert. denied,    U.S.   , 139 S. Ct. 917, 202 L. Ed. 2d 648 (2019); *State* v. *Mootz*, 808 N.W.2d 207, 219 (Iowa 2012) ("[Iowa] cases have repeatedly noted that a juror's interactions with law enforcement and the legal system are a valid, [race neutral] reason for a peremptory challenge"); *State* v. *Pendleton*, 725 N.W.2d 717, 727 (Minn. 2007) ("we are not persuaded that the state's reference to the prospective juror's equivocal feeling toward [the] police, as a result of her negative encounter with the [Willmar, Minnesota] police, is evidence that the state racially discriminated against the prospective juror by exercising a peremptory challenge"); *State* v. *Nave*, 284 Neb. 477, 487–88, 821 N.W.2d 723 (2012) (" 'heightened distrust of law enforcement personnel' " was race neutral reason for peremptory challenge), cert. denied, 568 U.S. 1236, 133 S. Ct. 1595, 185 L. Ed. 2d 591 (2013).

Some states—consistent with our decision in *Holmes*—have elected to address the failings of *Batson* through means other than construing state constitutional provisions to demand other protections. Leading the way is the Washington Supreme Court's decision in *State* v. *Saintcalle*, 178 Wn. 2d 34, 309 P.3d 326, cert. denied, 571 U.S. 1113, 134 S. Ct. 831, 187 L. Ed. 2d 691 (2013), which upheld "the trial court's finding that the prosecutor had not acted with purposeful discrimination in exercising a peremptory challenge, but also [took] the 'opportunity to examine whether [Washington's] *Batson* procedures are robust enough to effectively combat race discrimination in the selection of juries' . . . by convening a work group of relevant stakeholders to study the problem and [to] resolve it via the state's rule-making process, which is superintended by that court." (Citation omitted.) *State* v. *Holmes*, supra, 334 Conn. 246–47. Washington's highest court subsequently adopted a comprehensive rule of practice, Washington General Rule 37, which eliminated *Batson*'s requirement of purposeful discrimination in the use of peremptory challenges. See Wn. Gen. R. 37 (e). Instead, General Rule 37 asks only whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge"; Wn. Gen. R. 37 (e); and lists a number of reasons that are presumptively invalid, including a distrust of law enforcement. See Wn. Gen. R. 37 (h); see also *State* v. *Holmes*, supra, 334 Conn. 247–49 n.23 (providing full text of General Rule 37). The highest courts of New Jersey and Utah have also recently directed consideration of rule based remedies for disparate impact discrimination in jury selection.[25] See *State* v. *Andujar*, 247 N.J. 275, 317–18, 254 A.3d 606 (2021); *State* v. *Aziakanou*, 498 P.3d 391, 407 n.12 (Utah 2021).

Nevertheless, our independent research has revealed two recent state supreme court decisions that support the defendant's argument. Most recently, in *State* v. *Andujar*, supra, 247 N.J. 275, which was decided after oral argument in this appeal, the New Jersey Supreme Court, while directing a rule based, systemic remedy; see id., 317–18; also relied on the equal protection and jury trial provisions in that state's constitution to conclude that "implicit bias is no less real and no less problematic than intentional bias. The effects of both can be the same: a jury selection process that is tainted by discrimination." Id., 303. The court observed: "From the standpoint of the [New Jersey] [c]onstitution, it makes little sense to condemn one form of racial discrimination yet permit another. What matters is that juries selected to hear and decide cases are chosen free from racial bias—whether deliberate or unintentional." Id. The New Jersey court then concluded that the record demonstrated that the jury selection process in that case had been tainted by implicit bias, given the prosecutor's request of a criminal background check of a minority juror who had been seated the day before over the prosecutor's objection. Id., 312. That background check revealed that the juror had not been entirely truthful in his answers about his personal criminal history, although his criminal record would not have disqualified him from service. See id., 312–14; see also id., 308–309 (invoking supervisory authority to require "any party seeking to run a criminal history check on a prospective juror [to] first get permission from the trial court," emphasizing that "the prosecution or defense should present a reasonable, individualized, [good faith] basis to believe that a record check might reveal pertinent information unlikely to be uncovered through the ordinary voir dire process," with "mere hunches" being insufficient and reasons such as distrust of law enforcement being presumptively invalid, and affording both parties notice and opportunity to be heard).

In *State* v. *Jefferson*, 192 Wn. 2d 225, 249, 429 P.3d 467 (2018), the Washington Supreme Court appeared to exercise its authority to provide greater protections under the state constitution and modified the *Batson* framework, as applied in that state, in order to render the substance of General Rule 37, adopted after that court's decision in *State* v. *Saintcalle*, supra, 178 Wn. 2d 34, applicable in pending appeals.[26] Bearing in mind "the pervasive force of unconscious bias"; *State* v. *Jefferson*, supra, 251; the court held that "the question at the third step of the *Batson* framework is *not* whether the proponent of the peremptory strike is acting out of purposeful discrimination. Instead, the relevant question is whether 'an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge.' " (Emphasis in original.) Id., 249. Given the objective nature of the new standard, the court also applied de novo review in determining whether race

was a factor in the state's exercise of a peremptory challenge. Id., 249–50.

Although there is a persuasive body of recent sister state case law expressing dissatisfaction with the *Batson* framework in combatting implicit bias and disparate impact effects during jury selection, those cases extending state constitutional protections to this area are factually or legally distinguishable—at least at this point. First, the New Jersey and Washington constitutions considered in *Andujar* and *Jefferson*, respectively, do not have a specific guarantee of peremptory challenges like article first, § 19, of the Connecticut constitution. Second, the Washington court's decision in *Jefferson* followed the final adoption of a court rule on this point; it rendered that rule's provisions applicable to pending cases, rather than acting in the first instance. Thus, neither decision provides overwhelming support for an ultimate conclusion that the best remedy at this time for the shortcomings of *Batson* lies in state constitutional adjudication.

6

### Economic, Sociological, and Public Policy Considerations

"[T]he economic and sociological considerations factor . . . is in essence a public policy analysis . . . ." *Fay* v. *Merrill*, supra, 338 Conn. 50. The public policy arguments set forth by both parties demonstrate the complexity and importance of addressing implicit bias and disparate impact in the jury selection process. As this court previously recognized, there are significant public policy and sociological reasons to support the conclusion that a negative perception or distrust of law enforcement or the criminal justice system is not a race neutral reason to exclude a venireperson, given the disparate impact that such a reason has on racial minorities. See *State* v. *Holmes*, supra, 334 Conn. 236–37. As we stated in *Holmes*, the *Batson* framework has widely been considered "a toothless tiger when it comes to combating racially motivated jury selection . . . ." Id., 236.

The report of the Task Force commissioned in *Holmes* demonstrates the present failings of the *Batson* framework. The report emphasizes the Task Force's conclusion that implicit bias and disparate impact " 'raise extremely serious concerns with respect to the public perception and fairness of the criminal justice system.' " Jury Selection Task Force, Report of the Jury Selection Task Force to Chief Justice Richard A. Robinson (December 31, 2020) p. 19, available at https://jud.ct.gov/Committees/jury_task force/ReportJurySelectionTaskForce.pdf (last visited March 15, 2022), quoting *State* v. *Holmes*, supra, 334 Conn. 234. The Task Force therefore proposed a new rule of practice to address the role of implicit bias and disparate impact insofar as they both contribute to the

exclusion of potential jurors on the basis of race or ethnicity, particularly with respect to the exercise of peremptory challenges.[27] Jury Selection Task Force, supra, p. 20. The new rule would replace Connecticut's modified, three step *Batson* test with a wholly different methodology, eliminating the necessity of proving purposeful discrimination and considering, instead, whether "the use of the challenge against the prospective juror, as reasonably viewed by an objective observer, legitimately raises the appearance that the prospective juror's race or ethnicity was a factor in the challenge . . . ." Id., p. 16. The Task Force's proposed rule would require trial judges to articulate their reasoning in ruling on peremptory challenges and would deem certain reasons for peremptory challenges presumptively invalid. Id. It also would provide a new standard of appellate review applicable to claims of racial or ethnic discrimination in jury selection. Id.

Principles of judicial restraint counsel against this court making a sweeping constitutional pronouncement when the process of addressing the deficiencies of *Batson* is ongoing through the rule-making process, superintended by the Rules Committee. Cf. *State* v. *Lockhart*, 298 Conn. 537, 561, 4 A.3d 1176 (2010) (declining to impose electronic recording requirement during custodial interrogations that was not mandated by state constitution because legislature is better suited to decide policy). The Rules Committee, which has the ability to conduct hearings and to respond to the positions of the various stakeholders before recommending action by the judges of the Superior Court,[28] "is charged . . . with the responsibility of formulating rules of practice and procedure that directly control the conduct of litigation. It sets the parameters of the adjudicative process that regulates the interactions between individual litigants and the courts." *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, 192 Conn. 234, 246, 472 A.2d 9 (1984). On December 13, 2021, the Rules Committee voted to submit the Task Force's proposed rule for a public hearing prior to consideration by the judges of the Superior Court. See Rules Committee of the Superior Court, Minutes of the Meeting (December 13, 2021) p. 2, available at https://www.jud.ct.gov/Committees/rules/rules_minutes_121321.pdf (last visited March 15, 2022). Thus, although the public policy factor weighs substantially in favor of an alteration to the *Batson* analysis, it does not support the defendant's claim that such a remedy requires us to resort immediately to new constitutional standards. A restrained approach is prudent in these circumstances, particularly given the ongoing rule-making process previously set into motion by the comprehensive report and recommendation of the Task Force.

Having reviewed the relevant case law and materials revealed by our *Geisler* analysis, we are not prepared to conclude, on this record, that a prosecutor's exercise

of a peremptory challenge on the basis of a venire-person's negative perceptions or distrust of law enforcement or the criminal justice system constitutes an impermissible, race based reason under the Connecticut constitution pursuant to the second step of the *Batson* inquiry. Without making any final pronouncement on the matter, or issuing a determination applicable to any and all factual scenarios involving the exercise of peremptory challenges on the basis of negative perceptions of this nature, we are disinclined on the present record to hold that greater protection is warranted under the Connecticut constitution than is provided under the existing federal *Batson* scheme.

B

Pretext Analysis Under the Third Prong of *Batson*

We now turn to the third step of the *Batson* inquiry to determine whether the reasons provided by the prosecutor in exercising peremptory challenges were pretexts for purposeful discrimination.[29] See, e.g., *State* v. *Edwards*, supra, 314 Conn. 493. We begin by setting forth the standard of review. "The third *Batson* step . . . requires the court to determine if the prosecutor's proffered race neutral explanation is pretextual. . . . Deference [to the trial court's findings of credibility] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations. . . . Whether pretext exists is a factual question, and, therefore, we shall not disturb the trial court's finding unless it is clearly erroneous."[30] (Internal quotation marks omitted.) *State* v. *Holmes*, supra, 334 Conn. 226.

"In evaluating pretext, the court must assess the persuasiveness of the proffered explanation and whether the party exercising the challenge was, in fact, motivated by race. . . . Thus, although an improbable explanation might pass muster under the second step, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination at the third stage of the inquiry. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race . . . were asked a question to elicit a particular response that was not asked of other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike]

advanced an explanation based on a group bias [when] the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .

"In deciding the ultimate issue of discriminatory intent, the [court] is entitled to assess each explanation in light of all the other evidence relevant to [a party's] intent. The [court] may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . Ultimately, the party asserting the *Batson* claim carries the . . . burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination." (Internal quotation marks omitted.) Id., 224–25.

The defendant first argues that the prosecutor's questioning of both N.L. and C.J. was uniquely targeted in his focus on their respective criminal histories. Specifically, concerning C.J., defense counsel argued during voir dire, echoed in the defendant's brief on appeal, that the prosecutor's questions to C.J. about his convictions and the answers in his juror questionnaire were more extensive than those posed to other jurors. In response, the state argues that the prosecutor's extended questioning of C.J. regarding his criminal history was a product of his incomplete juror questionnaire and the "piecemeal disclosure" of his criminal history. Similarly, the trial court noted that the questioning of C.J. was consistent with the questioning of other jurors.

We conclude that the trial court did not commit clear error in determining that the race neutral reasons proffered by the prosecutor were not a pretext for impermissible discrimination. The record demonstrates that the prosecutor asked each potential juror if they, or someone who was close to them, had ever been arrested or charged with a crime. The state further points out that each affirmative response was followed by questions regarding the details of that arrest or charge and whether it would influence that venireperson in his or her service as a juror. Although the questioning regarding C.J.'s criminal history was more extensive, the record indicates that the more extensive questioning reflected the incomplete answers that C.J. had provided both during voir dire and in his juror questionnaire.

The defendant further points out that, of the four venirepersons who admitted to having previously been arrested, the state exercised three peremptory challenges, and the court dismissed the fourth for cause. The record does not indicate the races of those venire-

persons, other than C.J. and N.L.,[31] and, therefore, it does not support an inference or a pattern of the prosecutor's exclusion of potential jurors of a particular race. Indeed, no *Batson* claim was raised with respect to either of the other jurors with criminal histories excused by the prosecutor's peremptory challenges. Accordingly, we conclude that the trial court did not commit clear error in determining that the defendant failed to meet his burden of proving, by a preponderance of the evidence, that the jury selection process in his case was tainted by purposeful discrimination.

## II

### DOUBLE JEOPARDY CLAIMS

The defendant next claims that his right to be free from double jeopardy was violated as a result of his conviction of two counts of risk of injury to a child in violation of § 53-21 (a) (2), in addition to his conviction of sexual assault in the first degree in violation of § 53a-70 (a) (2), attempt to commit sexual assault in the first degree in violation of §§ 53a-70 (a) (2) and 53a-49 (a) (2), and sexual assault in the fourth degree in violation of § 53a-73 (a) (1) (A).[32] See footnotes 2, 5, 6 and 7 of this opinion (relevant text of statutory provisions). Relying on the Appellate Court's decision in *State* v. *Tinsley*, 197 Conn. App. 302, 232 A.3d 86 (2020), rev'd, 340 Conn. 425, 264 A.3d 560 (2021), the defendant asserts that, as charged in the information, it is not possible to commit the offenses of sexual assault in the first and fourth degrees without having already committed risk of injury to a child and, therefore, that risk of injury to a child is a lesser included offense of both sexual assault charges, as described in the information. In response, the state relies heavily on this court's decision in *State* v. *Alvaro F.*, 291 Conn. 1, 10, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009), and argues that, even if it is assumed that the offenses arose out of the same act or transaction, they are not the "same offense" under the well established standard set forth in *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). Guided by our recent decision in *State* v. *Tinsley*, 340 Conn. 425, 264 A.3d 560 (2021), which reversed the Appellate Court's decision on which the defendant relies; id., 428; we conclude that the defendant's right against double jeopardy was not violated because the offenses of sexual assault in the first and fourth degrees contain distinct elements from that of risk of injury to a child, rendering them not greater and lesser included offenses.

We first address the appropriate standard of review. "A defendant's double jeopardy claim presents a question of law, over which our review is plenary. . . . The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in

jeopardy of life or limb. The double jeopardy clause [applies] to the states through the due process clause of the fourteenth amendment. . . . This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial." (Internal quotation marks omitted.) *State* v. *Porter*, 328 Conn. 648, 654–55, 182 A.3d 625 (2018).

"Double jeopardy analysis in the context of a single trial is a [two step] process, and, to succeed, the defendant must satisfy both steps. . . . First, the charges must arise out of the same act or transaction [step one]. Second, it must be determined whether the charged crimes are the same offense [step two]. Multiple punishments are forbidden only if both conditions are met. . . . At step two, we [t]raditionally . . . have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [When] the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 655; see *State* v. *Miranda*, 260 Conn. 93, 125, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); *State* v. *Goldson*, 178 Conn. 422, 424, 423 A.2d 114 (1979).

For purposes of the present analysis, we assume, without deciding, that step one of the *Blockburger* analysis is met, that is, that the state alleged in its information that the offenses in question arose from the same act or transaction. We therefore turn to the defendant's argument under step two, that is, that risk of injury to a child is a lesser included offense of sexual assault in the first and fourth degrees.

"Our case law has been consistent and unequivocal" that the second step of *Blockburger* "is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 328 Conn. 656; see, e.g., *State* v. *Bernacki*, 307 Conn. 1, 9, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013). When conducting this analysis, "we are concerned with theoretical possibilities, and do not focus on the evidence presented." (Internal quotation marks omitted.) *State* v. *Mezrioui*, 26 Conn. App. 395, 403–404, 602 A.2d 29, cert. denied, 224 Conn. 909, 617 A.2d 169 (1992).

The defendant argues that, notwithstanding the distinct elements of each offense charged, risk of injury to a child is a lesser included offense of sexual assault in the first and fourth degrees because of how each

charge was alleged in the information. We recently rejected this argument in *State* v. *Tinsley*, supra, 340 Conn. 434. In *Tinsley*, we clarified that "the 'manner described in the information' is relevant in determining whether one crime is a lesser included offense of another only to the extent the reviewing court is consulting the information in order to determine whether it alleges distinct elements for each offense, rather than to determine the particular factual predicate of the case." Id., 442. Therefore, we now consider the elements of each charge and consider whether each contains an element that the other does not.

In the present case, the defendant was convicted of first degree sexual assault in violation of § 53a-70 (a) (2), which requires the state to prove that (1) the defendant "engage[d] in sexual intercourse with another person," (2) "such other person is under thirteen years of age," and (3) "the [defendant] is more than two years older than such person . . . ." The defendant was also convicted of fourth degree sexual assault in violation of § 53a-73a (a) (1) (A). The state had to prove that "(1) the defendant intentionally subjected, (2) a person under the age of fifteen years, (3) to sexual contact. The term [s]exual contact for the purposes of § 53a-73a is further defined as any contact with the intimate parts of a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Alvaro F.*, supra, 291 Conn. 10. Finally, the defendant was charged with risk of injury to a child in violation of § 53-21 (a) (2). "To convict the defendant of risk of injury to a child under § 53-21 [a] (2), the state must prove that (1) the defendant had contact with the intimate parts of, or subjected to contact with his intimate parts, (2) a child under the age of sixteen years, (3) in a sexually and indecent manner likely to impair the health or morals of such child." (Internal quotation marks omitted.) Id.; accord *State* v. *Bletsch*, 281 Conn. 5, 28, 912 A.2d 992 (2007).

"Our courts have addressed the relationship between risk of injury to a child and the various degrees of sexual assault in the context of double jeopardy claims on several occasions, each time concluding that the two crimes do not constitute the same offense"; *State* v. *Alvaro F.*, supra, 291 Conn. 7; and we decline to come to a different conclusion in the present case.[33] See id., 9 (convictions of risk of injury to child and fourth degree sexual assault did not violate prohibition against double jeopardy); *State* v. *Bletsch*, supra, 281 Conn. 28–29 (sexual assault in second degree and risk of injury to child are not same offense because language of two statutes makes it possible to have "sexual intercourse" under

General Statutes § 53a-71 (a) without touching victim's "intimate parts" under General Statutes (Rev. to 1999) § 53-21 (2), and vice versa); *State* v. *Ellison*, 79 Conn. App. 591, 602, 830 A.2d 812 (sexual assault in second degree and risk of injury to child are not same offense because sexual assault in second degree does not require contact to be " 'in a sexual and indecent manner likely to impair the health or morals of such child' "), cert. denied, 267 Conn. 901, 838 A.2d 211 (2003); *State* v. *Morris*, 49 Conn. App. 409, 419, 716 A.2d 897 ("the element of 'sexual contact,' included within the offense of sexual assault in the fourth degree, is not necessarily equivalent to the touching of the private parts of a child in a ' "sexual and indecent manner" ' . . . prohibited by the risk of injury to a child statute" (citation omitted)), cert. denied, 247 Conn. 904, 720 A.2d 516 (1998); see also *State* v. *James*, 211 Conn. 555, 586, 560 A.2d 426 (1989) ("[S]pecific intent is not an element of the crime defined in the second part of § 53-21 . . . . Only an intention to make the bodily movement [that] constitutes the act [that] the crime requires, which we have referred to as a general intent, is necessary." (Citations omitted; internal quotation marks omitted.)); *State* v. *Perruccio*, 192 Conn. 154, 162, 471 A.2d 632 ("sexual assault in the fourth degree and risk of injury [to a child] each require proof of an element not required by the other"), appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984); *State* v. *Shaw*, 186 Conn. 45, 51, 438 A.2d 872 (1982) (sexual assault in fourth degree requires additional specific intent element that risk of injury to child does not).

Sexual assault in the first degree in violation of § 53a-70 (a) (2) requires proof that the defendant engaged in sexual intercourse with the victim and was more than two years older than the victim. Sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A) requires proof that the defendant intentionally subjected someone under the age of fifteen to sexual contact. Risk of injury to a child in violation of § 53-21 (a) (2) contains neither of those elements. In contrast, that statute requires proof only that the child was under the age of sixteen and that the defendant had contact with the child in a manner likely to impair the child's health or morals. From the statutory language, it is evident that each charge contains an element of proof that the other does not. Therefore, neither of the offenses constitutes a greater or lesser included offense of the other.

"Our analysis of [the defendant's] double jeopardy [claim] does not end, however, with a comparison of the offenses. The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling [when], for example, there is a clear indication of contrary legislative intent. . . . Thus, the *Blockburger* test creates only a rebuttable presumption of legislative

intent, [and] the test is not controlling when a contrary intent is manifest. . . . When the conclusion reached under *Blockburger* is that the two crimes do not constitute the same offense, the burden remains on the defendant to demonstrate a clear legislative intent to the contrary." (Internal quotation marks omitted.) *State* v. *Schovanec*, 326 Conn. 310, 326, 163 A.3d 581 (2017); see *State* v. *Tinsley*, supra, 340 Conn. 445–46. The defendant in the present case, however, does not argue that the legislature intended to treat §§ 53a-70 (a) (2) and 53a-73a (a) (1) (A), on the one hand, and § 53-21 (a) (2), on the other, as the same offense for double jeopardy purposes. Accordingly, we conclude that, because §§ 53a-70 (a) (2) and 53a-73a (a) (1) (A), and § 53-21 (a) (2) are not the same offense for double jeopardy purposes, the defendant's conviction of two counts of risk of injury does not violate his right to be free from double jeopardy.

The judgment is affirmed.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony . . . ."

Although § 53-21 has been amended numerous times since the defendant's commission of the crimes that formed the basis of his conviction; see, e.g., Public Acts 2007, No. 07-143, § 4; Public Acts 2013, No. 13-297, § 1; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 53-21 throughout this opinion.

[3] *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[4] The victim testified that the defendant forcibly kissed her, put his tongue inside her mouth and on her vagina, attempted, but failed, to insert his penis in her vagina, touched her breasts and her outer vaginal area, and made her touch his penis.

[5] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

Section 53a-70 was amended by No. 02-138, § 5, of the 2002 Public Acts and No. 15-211, § 16, of the 2015 Public Acts. Those amendments made certain changes to the statute that are not relevant to this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[6] General Statutes (Rev. to 2001) § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when: (1) Such person intentionally subjects another person to sexual contact who is (A) under fifteen years of age . . . ."

All references to § 53a-73a in this opinion are to the 2001 revision of the statute.

[7] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[8] Following oral argument, this court sua sponte ordered the parties to submit simultaneous supplemental briefs, limited to the following issue: "Whether this court should exercise its supervisory powers to hold, pursuant to the proposal of the Jury Selection Task Force, that, '[t]he denial of an objection to a peremptory challenge shall be reviewed by an appellate court de novo, except [that] the trial court's express factual findings shall be reviewed under a clearly erroneous standard.' Jury Selection Task Force, Report [of the Jury Selection Task Force] to Chief Justice Richard A. Robinson (December 31, 2020) p. 16 [available at https://jud.ct.gov/Committees/jury_taskforce/ReportJurySelectionTaskForce.pdf (last visited March 15, 2022)]. But see id., pp. 22–23, statement of Judge Douglas Lavine in Opposition."

We also invited amici curiae to file briefs on this issue. We are grateful to the following amici curiae for responding to our invitation with their thoughtful briefs: (1) Harry Weller, Peter T. Zarella, and C. Ian McLachlan; (2) the Office of the Chief Public Defender; (3) the Office of the Attorney General; (4) the Commission on Human Rights and Opportunities; (5) David N. Rosen; (6) NAACP Legal Defense and Educational Fund, Inc.; (7) the Connecticut Trial Lawyers Association; and (8) Professors and Research Scholars at Connecticut's Law Schools.

[9] We note that the record indicates that C.J. is an African-American man. The record does not specify the racial identity of N.L., but it is undisputed that she is a member of a racial minority.

[10] The record reveals the following additional colloquy concerning the sexual assault allegations against N.L.'s acquaintance:

"[The Prosecutor]: This was a friend of—

"[N.L.]: My husband's.

"[The Prosecutor]: Do you ever talk to him about any of this?

"[N.L.]: No.

"[The Prosecutor]: Were you personally close to this person?

"[N.L.]: Not close, but I know who he is.

"[The Prosecutor]: Anything about that that would make you think, I can't sit on this case?

"[N.L.]: No. I didn't believe the allegations.

"[The Prosecutor]: Why didn't you believe the allegations?

"[N.L.]: Because of the circumstances, how it was told to me, not me knowing personally, and [I] didn't feel like it was true to me. I felt like he just took it because he's already been convicted of something else, which ha[s] nothing to do with that. And he just—I guess they told him, if he didn't take the deal, this would happen.

"[The Prosecutor]: Anything about that situation with him that you think might impact your decision [in] this case?

"[N.L.]: No."

[11] The record reveals the following additional colloquy about N.L.'s conviction:

"[The Prosecutor]: How long ago was this?

"[N.L.]: '97, '95, '97.

"[Prosecutor]: Did it involve any children?

"[N.L.]: No.

"[The Prosecutor]: Anything about a sexual assault?

"[N.L.]: No."

[12] The other reasons the prosecutor provided for the peremptory challenge were (1) N.L.'s initial response that she would not be able to convict the defendant based on the testimony of a single witness, (2) her initial response that she would not be able to return a guilty verdict if she were not 100 percent certain, and (3) her disbelief of the allegations of sexual assault against her husband's friend.

[13] The trial court cited the following additional observation regarding N.L.: "There was an additional issue that [the prosecutor] did raise . . . which was when [N.L.] said that she would expect a sexual assault victim to report [the assault] immediately to the police. That's obviously not this case. I do think there were race neutral reasons to remove her at this time."

[14] The record reveals the following colloquy about C.J.'s arrest for the incident with the police officer:

"[The Prosecutor]: And when was that?

"[C.J.]: That was over thirty-five years ago, almost forty years ago, probably. Thirty-five.

"[The Prosecutor]: So did you go to jail?

"[C.J.]: I was already in jail. I never got out.

"[The Prosecutor]: You were in jail for what?"

"[C.J.]: Went from the incident, from the time it happened . . . until they gave me that disposition, so, by the time I got the disposition, it was almost like time served.

"[The Prosecutor]: Okay. So how much time do you think you—

"[C.J.]: Sixteen months.

"[The Prosecutor]: Okay. And that was how long ago?

"[C.J.]: That was all the way back in '87.

"[The Prosecutor]: Besides that one time, were you ever arrested any other time?

"[C.J.]: No. All—everything ended over thirty years [ago]. That's it.

"[The Prosecutor]: That's the only time you were ever arrested?

"[C.J.]: Well . . . everything was in that time period. [Nineteen ninety-seven] was the end, when the charge was done with.

"[The Prosecutor]: Say that again.

"[C.J.]: All of those arrests [were] in that time frame. It was the same thing. Violation of probation to all this stuff right here."

[15] The record reveals the following colloquy with respect to the Stop and Shop incident:

"[The Prosecutor]: That was—

"[C.J.]: That's what I was talking about.

"[The Prosecutor]: That was in 2011?

"[C.J.]: In '11. So that's what I was talking about. It was—but they—that was—I worked for that company.

"[The Prosecutor]: Okay. So—

"[C.J.]: So they—they—that's how. Because I didn't have a receipt for those items, because, through the night . . . I was stocking and everything, rushing. We had two alarm calls, a whole bunch of things [were] happening, and, when I was leaving in the morning, I didn't even pay attention that those didn't get scanned out, so when I went to court, they dropped all that stuff."

[16] The trial court found the prosecutor's questioning of C.J. to be consistent with that of the other prospective jurors, noting: "[O]n our first day of jury selection, there was a [prospective] juror . . . who was a white male . . . who had been previously found not guilty but [who] was prosecuted for operating under the influence, and he was not selected by the state. . . . I believe this is a race neutral reason, and I find the questioning so far, from what I observed, to be consistent and nothing pretextual that would warrant the court to take further actions."

[17] "We note that a *Batson* inquiry under Connecticut law is different from most federal and state *Batson* inquiries. Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. . . . Pursuant to this court's supervisory authority over the administration of justice, we have eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination." (Internal quotation marks omitted.) *State* v. *Holmes*, supra, 334 Conn. 223–24 n.15; see *State* v. *Holloway*, 209 Conn. 636, 646 and n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

[18] The defendant concedes that, as a matter of federal constitutional law in the wake of the United States Supreme Court's decision in *Hernandez* v. *New York*, 500 U.S. 352, 362–63, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991), distrust of law enforcement is a facially race neutral reason to exclude a potential juror under the United States constitution. See *State* v. *Holmes*, supra, 334 Conn. 231–33; see also footnote 22 of this opinion and accompanying text.

[19] Article first, § 1, of the Connecticut constitution provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

Article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments, provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . in all prosecutions by information, to a speedy, public trial by an impartial jury. No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 19, of the Connecticut constitution, as amended by article

four of the amendments, provides in relevant part: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law . . . . In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

Article first, § 20, of the Connecticut constitution, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[20] We note that the defendant did not claim at trial that distrust of the criminal justice system was not a race neutral reason under either the state or federal constitution for the peremptory challenges of N.L and C.J. Although unpreserved, the defendant's constitutional claims nevertheless are reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). *Golding* requires the following conditions to be met in order for a defendant to prevail on a claim of constitutional error not preserved at trial: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 239–40; see *In re Yasiel R.*, supra, 781.

The state asserts, however, that the defendant's claim has "no basis in fact" and, thus, is not reviewable under *Golding* because "neither N.L. nor C.J. was excused on the basis of distrust of the criminal justice system born of personal experience." The record does not support this argument. The prosecutor's stated reasons for excusing both N.L. and C.J. expressly included, to some extent, their distrust or resentment of the police or the criminal justice system. In exercising a peremptory challenge to N.L., the prosecutor referenced N.L.'s criminal history and reluctance to discuss her prior arrest, as well as her *resentment* toward the police. Similarly, the prosecutor referenced C.J.'s apparent reluctance to discuss his criminal record, as well as his belief that he was not "correctly accused or rightfully charged" of assaulting a police officer. We therefore disagree with the state's argument that there is no basis in fact for the defendant's claim that both venirepersons were excused because of their distrust of the criminal justice system.

[21] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."

The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[22] See *United States* v. *Arnold*, 835 F.3d 833, 842 (8th Cir. 2016) ("[a prospective] juror's bias or dissatisfaction with law enforcement is a [race neutral] reason for striking the juror" (internal quotation marks omitted)); *United States* v. *Brown*, 809 F.3d 371, 376 (7th Cir.) ("we have acknowledged that bias against law enforcement is a legitimate [race neutral] justification"), cert. denied, 578 U.S. 977, 136 S. Ct. 2034, 195 L. Ed. 2d 219 (2016); *United States* v. *Alvarez-Ulloa*, 784 F.3d 558, 567 (9th Cir. 2015) (distrust of law enforcement is valid ground for peremptory strike); *United States* v. *Moore*, 651 F.3d 30, 43 (D.C. Cir. 2011) ("[the prospective juror's] concern about 'rogue police officers,' and a 'bad experience' with law enforcement that '[l]eft a bad taste' . . . provided a [race neutral] explanation for the prosecution's decision to strike her" (citation omitted)), aff'd sub nom. *Smith* v. *United States*, 568 U.S. 106, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013); *United States* v. *Gamory*, 635 F.3d 480, 496 (11th Cir.) (noting that "[the prospective juror] harbored doubts about her ability to be impartial based [on] her belief that her brother had been the victim of police brutality" and that this characteristic "is [not] peculiar to any race"), cert. denied, 565 U.S. 1080, 132 S. Ct. 826, 181 L. Ed. 2d 527 (2011); *United States* v. *Carter*, 111 F.3d 509, 511–12 (7th Cir. 1997) (prior negative experience with law enforcement

was race neutral reason to exclude prospective juror); *United States* v. *Rudas*, 905 F.2d 38, 41 (2d Cir. 1990) (prospective juror's potential prejudice against law enforcement was race neutral reason to exclude him); *United States* v. *Thomas*, Docket No. 2:19-cr-00461-LSC-JHE-3, 2021 WL 76562, *5–6 (N.D. Ala. January 8, 2021) (rejecting defendant's argument that fear or distrust of law enforcement is not race neutral reason for peremptory challenge); *Jordan* v. *Lefevre*, 22 F. Supp. 2d 259, 272 (S.D.N.Y. 1998) ("[n]egative experience with law enforcement has been found to constitute a [race neutral] factor for peremptorily challenging a [prospective] juror"), rev'd in part on other grounds, 206 F.3d 196 (2d Cir. 2000).

[23] The defendant also relies on this court's decision in *State* v. *Brown*, 232 Conn. 431, 451, 656 A.2d 997 (1995), which held that the impartial jury provision of article first, § 8, "requires the trial court to ensure that a jury remains impartial and unprejudiced throughout the trial," in tasking our trial judges with "an independent obligation" to investigate by holding an evidentiary hearing when alerted of juror misconduct. That decision was, however, superseded after an en banc rehearing by this court in *State* v. *Brown*, 235 Conn. 502, 525–26, 668 A.2d 1288 (1995), which retreated from the state constitutional analysis and utilized the court's supervisory authority to mandate only a preliminary inquiry into juror misconduct, the scope of which remains within the trial court's discretion. See id., 537–38 (*Berdon, J.*, dissenting) (criticizing majority's conclusion that hearing was required under supervisory authority, rather than state constitution, given that "the jury is a bedrock of our democracy" and that "the allegations involved the jury's possible exposure to racist remarks made by the court's own sheriffs").

[24] "General Statutes § 51-232 (c) provides: 'The Jury Administrator shall send to a prospective juror a juror confirmation form and a confidential juror questionnaire. Such questionnaire shall include questions eliciting the juror's name, age, race and ethnicity, occupation, education and information usually raised in voir dire examination. The questionnaire shall inform the prospective juror that information concerning race and ethnicity is required solely to enforce nondiscrimination in jury selection, that the furnishing of such information is not a prerequisite to being qualified for jury service and that such information need not be furnished if the prospective juror finds it objectionable to do so. Such juror confirmation form and confidential juror questionnaire shall be signed by the prospective juror under penalty of false statement. Copies of the completed questionnaires shall be provided to the judge and counsel for use during voir dire or in preparation therefor. Counsel shall be required to return such copies to the clerk of the court upon completion of the voir dire. Except for disclosure made during voir dire or unless the court orders otherwise, information inserted by jurors shall be held in confidence by the court, the parties, counsel and their authorized agents. Such completed questionnaires shall not constitute a public record.' " *State* v. *Holmes*, supra, 334 Conn. 251–52 n.27.

[25] In this vein, California recently enacted legislation, signed into law on September 30, 2020, similar in substance to Washington's General Rule 37 and the rule proposed by the Task Force, that enumerates presumptively invalid reasons for the exercise of peremptory challenges. See Assembly Bill No. 3070, §§ 2 and 4 (Cal. 2020), codified at Cal. Civ. Pro. Code § 231.7 (Deering Supp. 2021). Similar legislation is pending in Massachusetts, and several other states are studying the issue through task forces or commissions. See Berkeley Law Death Penalty Clinic, "Batson Reform: State by State," available at https://www.law.berkeley.edu/experiential/clinics/death-penalty-clinic/projects-and-cases/whitewashing-the-jury-box-how-california-perpetuates-the-discriminatory-exclusion-of-black-and-latinx-jurors/batson-reform-state-by-state/ (last visited March 15, 2022).

We note that Arizona has gone one step further. The Arizona Supreme Court recently amended that state's civil and criminal rules of practice to eliminate peremptory challenges entirely. See Ariz. R. Civ. Proc. 47 (e); Ariz. R. Crim. Proc. 18.4 and 18.5; see also Berkeley Law Death Penalty Clinic, supra (noting legislation pending in New York to eliminate peremptory challenges); see also *State* v. *Holmes*, supra, 334 Conn. 254 (*Mullins, J.*, concurring) (suggesting "substantially restricting the use," or "substantially reduc[ing] the number," of peremptory challenges as "the next best thing" to their elimination while comporting with provision of peremptory challenges in article first, § 19, of Connecticut constitution).

[26] We note that the doctrinal basis for the Washington court's decision to change the *Batson* framework in *Jefferson* is not entirely clear. For the authority to do so, the court does not tie its decision to any particular provision of the Washington constitution but, instead, cites its prior decisions

in *Seattle* v. *Erickson*, 188 Wn. 2d 721, 733–34, 398 P.3d 1124 (2017), and *State* v. *Saintcalle*, supra, 178 Wn. 2d 51. See *State* v. *Jefferson*, supra, 192 Wn. 2d 249. The court's decision in *Erickson* is doctrinally silent with respect to the authority for changing the *Batson* framework, itself citing only to *Saintcalle*. See *Seattle* v. *Erickson*, supra, 733–34. A review of the cited portion of *Saintcalle* reveals that the court discussed, but did need not to choose, given the rules based disposition of that case, several options for altering the *Batson* framework, including both (1) "authority under federal law to pioneer new procedures within existing [f]ourteenth [a]mendment frameworks," and (2) "greater-than-federal *Batson* protections to defendants under the greater protection afforded under [the Washington] state jury trial right . . . ." *State* v. *Saintcalle*, supra, 51.

[27] The proposed rule provides in relevant part: "(a) Policy and Purpose. The purpose of this rule is to eliminate the unfair exclusion of potential jurors based upon race or ethnicity.

"(b) Scope; Appellate Review. The rule applies to all parties in all jury trials. The denial of an objection to a peremptory challenge made under this rule shall be reviewed by an appellate court de novo, except that the trial court's express factual findings shall be reviewed under a clearly erroneous standard. The reviewing court shall not impute to the trial court any findings, including findings of the prospective juror's demeanor, which the trial court did not expressly state on the record. The reviewing court shall consider only reasons actually given and shall not speculate as to, or consider reasons, that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors, who are not members of the same protected group as the challenged juror. Should the reviewing court determine that the objection was erroneously denied, then the error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial.

"(c) Objection. A party may object to the use of a peremptory challenge to raise a claim of improper bias. The court may also raise this objection on its own. The objection shall be made by simple citation to this rule, and any further discussion shall be conducted outside the presence of the prospective juror.

"(d) Response. Upon objection to the exercise of a peremptory challenge pursuant to this rule, the party exercising the peremptory challenge shall articulate the reason that the peremptory challenge has been exercised.

"(e) Determination. The court shall then evaluate from the perspective of an objective observer, as defined in section (f) herein, the reason given to justify the peremptory challenge in light of the totality of the circumstances. If the court determines that the use of the challenge against the prospective juror, as reasonably viewed by an objective observer, legitimately raises the appearance that the prospective juror's race or ethnicity was a factor in the challenge, then the challenge shall be disallowed and the prospective juror shall be seated. If the court determines that the use of the challenge does not raise such an appearance, then the challenge shall be permitted and the prospective juror shall be excused. The court need not find purposeful discrimination to disallow the peremptory challenge. The court must explain its ruling on the record. A party whose peremptory challenge has been disallowed pursuant to this rule shall not be prohibited from attempting to challenge peremptorily the prospective juror for any other reason, or from conducting further voir dire of the prospective juror.

"(f) Nature of Observer. For the purpose of this rule, an objective observer (1) is aware that purposeful discrimination, and implicit, institutional, and unconscious biases, have historically resulted in the unfair exclusion of potential jurors on the basis of their race, or ethnicity; and (2) is deemed to be aware of and to have given due consideration to the circumstances set forth in section (g) herein.

"(g) Circumstances considered. In making its determination, the circumstances the court should consider include, but are not limited to, the following: (i) the number and types of questions posed to the prospective juror including consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the questions asked about it; (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the prospective juror, unrelated to his testimony, than were asked of other prospective jurors; (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party; (iv) whether a reason might be disproportionately associated with a race or ethnicity; (v) if the party has used peremptory challenges disproportionately

against a given race or ethnicity in the present case, or has been found by a court to have done so in a previous case; (vi) whether issues concerning race or ethnicity play a part in the facts of the case to be tried; (vii) whether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record.

"(h) Reasons Presumptively Invalid. Because historically the following reasons for peremptory challenges have been associated with improper discrimination in jury selection in Connecticut or maybe influenced by implicit or explicit bias, the following are presumptively invalid reasons for a peremptory challenge: (1) having prior contact with law enforcement officers; (ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling; (iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime; (iv) living in a high-crime neighborhood; (v) having a child outside of marriage; (vi) receiving state benefits; (vii) not being a native English speaker; and (viii) having been a victim of a crime. The presumptive invalidity of any such reason may be overcome as to the use of a peremptory challenge on a prospective juror if the party exercising the challenge demonstrates to the court's satisfaction that the reason, viewed reasonably and objectively, is unrelated to the prospective juror's race or ethnicity and, while not seen by the court as sufficient to warrant excusal for cause, legitimately bears on the prospective juror's ability to be fair and impartial in light of particular facts and circumstances at issue in the case.

"(i) Reliance on Conduct. The following reasons for peremptory challenges also have historically been associated with improper discrimination in jury selection: allegations that the prospective juror was inattentive, failing to make eye contact or exhibited a problematic attitude, body language, or demeanor. If any party intends to offer one of these reasons or a similar reason as a justification for a peremptory challenge, that party must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner. A party who intends to exercise a peremptory challenge for reasons relating to those listed above . . . shall, as soon as practicable, notify the court and the other party in order to determine whether such conduct was observed by the court or that party. If the alleged conduct is not corroborated by observations of the court or the objecting party, then a presumption of invalidity shall apply but may be overcome as set forth in subsection (h).

"(j) Review Process. The chief justice shall appoint an individual or individuals to monitor issues relating to this rule." Jury Selection Task Force, supra, pp. 16–18.

[28] "The Rules Committee is a body composed of judges of the Superior Court. Its function is to consider proposed changes in the rules of practice for the Superior Court, and to recommend amendments to the Practice Book, which may be adopted by vote of the Superior Court judges. Once proposed Practice Book amendments have been approved by the Rules Committee, they are published in the Connecticut Law Journal, and are subject to public comment before their adoption by the judges." *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, 192 Conn. 234, 237, 472 A.2d 9 (1984).

[29] The state argues that "the defendant's claim of pretext is inadequately briefed and deficient because he has failed to demonstrate that [the] trial court's finding of no pretext is clearly erroneous on the basis of the entire . . . record." (Emphasis omitted.) We disagree. The defendant's brief spends several pages analyzing the record and comparing the voir dire of C.J. in particular to that of several other venirepersons in an attempt to establish pretext. But cf. *Getty Properties Corp.* v. *ATKR, LLC*, 315 Conn. 387, 413, 107 A.3d 931 (2015) (claim was inadequately briefed when appellants undertook "no analysis or application of the law to the facts of [the] case"); *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 444 n.40, 35 A.3d 188 (2012) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Citations omitted; internal quotation marks omitted.)).

[30] As we noted previously, after oral argument in this appeal, we ordered supplemental briefing and invited amicus curiae briefs on whether we should adopt the standard of appellate review proposed by the Task Force, which would provide for de novo review of denials of objections to peremptory challenges, with the exception of express factual findings that would remain subject to the clearly erroneous standard of review. See footnotes 8 and 27

of this opinion. Having considered these thoughtful briefs, we are constrained to agree with the state's argument that it would be premature to adopt this standard of appellate review before the judges of the Superior Court take action with respect to the rule of practice proposed by the Task Force, which the Rules Committee has voted to send for a public hearing in advance of action by the judges of the Superior Court. Accordingly, at this time, we decline to adopt the de novo standard of review in the absence of any change to the substantive *Batson* inquiry, and we leave that issue for another day.

[31] See footnote 9 of this opinion.

[32] Because this double jeopardy claim was not raised at trial, we review it—at the unopposed request of the defendant—pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See footnote 20 of this opinion.

[33] As this court noted in *Alvaro F.*, although the prior cases addressing this question involved the pre-1995 amendments to § 53-21, their reasoning remains relevant and persuasive. See *State* v. *Alvaro F.*, supra, 291 Conn. 8–9; see also footnote 2 of this opinion.